### BEAVER BOARD COS. v. IMBRIE et al.

### In re MONTREAL TRUST CO.

(Circuit Court of Appeals, Second Circuit.    January 21, 1924.)

### No. 147.

Liens ⚙⇒7—Pledges ⚙⇒1—Trusts ⚙⇒34(1)—Voluntary setting apart of bonds as security for depositor's account held not to create pledge, trust, or equitable lien.

. Where a member of a banking firm, on receiving a deposit without any agreement or understanding therefor with the depositor, and without his knowledge, directed that certain bonds owned by the firm be placed in safe-keeping for the account, from which they were afterward taken and restored to the general assets of the firm, and so passed into the hands of receivers, such transaction did not create a pledge, trust, or equitable lien in favor of the depositor.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in Equity by the Beaver Board Companies against James Imbrie and others, copartners as Imbrie & Co. The Montreal Trust Company appeals from an order denying its claim to lien. Affirmed.

Imbrie & Co. were partners as bankers and brokers. February 7, 1921, the Royal Bank of Canada, acting for the Montreal Trust Company, transmitted to Imbrie & Co. $145,239.50, to be used as the inclosing letter specifically explains, for "the redemption of $140,000 par value first mortgage 7 per cent. marine bonds" of the Mt. Royal Steamship Company, Limited. This remittance from the Royal Bank had been promised to Imbrie & Co. by the Montreal Trust Company in a letter of a few days earlier, in which letter the trust company had said that it thought "very few, if any, bonds will be presented to you" on the exact due date, and the money "is likely to remain with you practically untouched for a period of 60 days. In view of this, what rate of interest can you allow, say, while the money is in your hands?"

Imbrie & Co. acknowledged receipt of the funds, said that, as they regarded the matter as "practically a 60-days time deposit," 4 per cent. interest would be allowed, and stated that they would "credit [the trust company's] account with such interest." On receipt of the check for $145,239.50 by the senior active member of Imbrie & Co., he gave instructions to. the cashier to deposit the same in the general account of Imbrie & Co. in a New York bank and to "open an account as instructed by the letter."

This cashier testified that the senior partner "also told me to put 225 State of Santa Catherina bonds in safe-keeping for that account." These bonds belonged to Imbrie Co. The cashier communicated his instructions to an employee known as the security and loan clerk, who testified: "I took 225 bonds and put a rubber band around them and a memorandum, by reason of the fact that I could not get them in the safe-keeping envelope, it would not hold that many bonds; so I put a memorandum on them and put them in the safe-keeping box." The memorandum, according to this witness, read: "S. K. (meaning safe-keeping) Montreal Trust Company, Trustee." This clerk then made some entries in a book, of Imbrie & Co.'s, indicating, as he testified, that the Santa Catherina bonds had been placed in this particular box for the Montreal Trust Company, trustee. This was done on February 8, 1921. The bonds remained in the "safe-keeping box" until about the 23d of February, when the same loan and security clerk took them out of the so-called safe-keeping box and put them in one of the general boxes, which according to the evidence were used to contain securities belonging to the firm and securities to use on deliveries, whereas the so-called safe-keeping boxes were used to hold "securities belonging to clients, securities paid for."

⚙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The auditor of the firm, observing the book entry, said to the chief book-keeper: "You are all wrong; the [Montreal Trust Company] account shows that these people claim $145,000 and some hundreds, and likewise $225,000 bonds, which is not right." Thereupon the bookkeeper "killed the original entry as far as the securities went"—that is, he made the account show that the trust company was "not entitled to both the money and the bonds." This having been done on or about February 23d, the bonds were taken out of the safe-keeping box and returned to the general box, where they remained until the appointment of a receiver under a creditors' bill against Imbrie & Co. on March 3, 1921. When the receivers came into possession of the bonds, there was no memorandum upon them indicating that they had any connection with the Montreal Trust Company.

Thereupon the trust company brought its petition seeking an adjudication that "the 225 State of Santa Catherina * * * bonds [above] referred to are held by Imbrie & Co. as trustees for the benefit of your petitioner, or in the alternative that your petitioner has a lien upon said bonds" to secure so much of the said fund of $145,239.50 as "has been dissipated and cannot be traced." This petition was referred to a special master, who recommended that relief be refused, and that Montreal Trust Company rank merely as a general creditor.

The court below accepted and confirmed this recommendation, and from the order accordingly the trust company took this appeal.

Henry G. Gray, of New York City, for appellant.

Zalkin & Cohen, of New York City (Vincent T. Follmar, of New York City, of counsel), for appellees.

Ralph M. Ketcham, of New York City, for defendants.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The petition before us asks relief against receivers, who obtained the property affected without notice or knowledge of any of petitioner's asserted rights. Such rights are now affirmatively propounded; therefore by every rule of law the burden of proof is strongly on the petitioners.

The story told may fairly be called extraordinary, and in proportion as an allegation of fact departs from the usual, the demand for clarity in proof increases. The ultimate fact asserted is that a banker, who received a deposit, of his own motion intended to give the depositor security for the debt created by the deposit, although he had not been asked so to do, and did not intent to communicate to the creditor what he had done. Such a story might well rest primarily on the evidence of the one partner, who spoke the words out of which all this litigation arose. Yet he was not called to testify, and no reason is even suggested for the omission. The very fact of not procuring his evidence produces lack of clarity under the circumstances.

But, assuming that the facts above set forth were not only testified to by clerks, but are fully established, we think the court below right in dismissing petition. A supposed or asserted desire on the defendants' part that a possibly favored depositor should be more secure in his dealings with them than the common herd of customers is not enough; the acts shown must produce a legal result assignable to some legal category. Accordingly we feel assured that what was said and done amounted to nothing, if it did not create a pledge, a trust, or an equitable lien; and these are the contentions of appellant.

There was no pledge, because possession by the pledgee, the vital element of that legal relation, was absent. Casey v. Cavaroc, 96 U. S.

467, 24 L. Ed. 779. It is true that "apparent possession" may remain with the pledgor, but only when such physical holding is "as agent for the pledgee." Easton v. German Bank, 127 U. S. 532, 8 Sup. Ct. 1297, 32 L. Ed. 210. Of agency there is no proof at all, and Boise v. Talcott, (C. C. A.) 264 Fed. 61, sufficiently shows how difficult is the sustaining of an agreement of pledge, though accompanied by very formal arrangements for making the debtor the agent of the creditor.

There was no valid trust created, although it be admitted that the trust relation does not depend upon the use of any particular form of words; that the settlor need not part with possession, and the fact of settlement need not be communicated to the cestui que trust. What is necessary, as·all agree, is an explicit declaration of trust, or circumstances showing beyond reasonable doubt that it was intended to create a trust. We hold it too clear to justify discussion that the words attributed to the partner, not called to verify his own language, do not evidence a trust within the rule. Although arising under a very different state of facts, our discussion of this general subject in Re Interborough Corporation, 288 Fed. 334, covers this case in principle. This renders it unnecessary to consider the effect of the New York Lien Law, but see In re Fountain (C. C. A.) 282 Fed. 816, 25 A. L. R. 319. There was no equitable lien. This point is also covered by In re Interborough, supra. Such liens usually rest upon an antecedent and underlying contract; in the exceptional case they result by implication from an enforceable obligation or duty resting on the creator of the lien. In every case the right or charge is completed by equity, in pursuance of the maxim that that is deemed done that ought to be done.

Here there was no contract out of which the lien could grow, nor the slightest duty resting on defendants to give to petitioners any charge or lien whatever; therefore no basis for a lien exists. Further the proof is deficient. Equitable liens demand strict proof of "intention of parties." Westinghouse v. Brooklyn, etc., Co. (C. C. A.) 263 Fed. 532, approving In re Stiger, 209 Fed. 148, 126 C. C. A. 96. Indeed, the claim of lien fails for substantially the same reason as does the argument for a trust; e. g., Wadd v. Hazelton, 137 N. Y. 215, 33 N. E. 143, 21 L. R. A. 693, 33 Am. St. Rep. 707.

Order affirmed, with costs.