In the Matter of the Application of the PEOPLE OF THE STATE OF NEW YORK, by GEORGE S. VAN SCHAICK, as Superintendent of Insurance of the State of New York, for an Order to Take Possession of the Property of and Rehabilitate the BOND AND MORTGAGE GUARANTEE COMPANY.

In the Matter of the Plan of Readjustment of the Rights of the Holders of Investments in a Mortgage Covering Premises Known as HALF MOON HOTEL, Coney Island, Brooklyn, Guaranteed by BOND AND MORTGAGE GUARANTEE COMPANY. (Guarantee No. 186,039.)

JACK L. ALPERT et al., Appellants and Respondents; WALTER McMEEKAN, as Trustee, et al., Respondents and Appellants.

Argued November 29, 1951; decided January 24, 1952.

424

*Leo E. Sherman, William I. Alpert* and *Abraham Alpert* for appellants and respondents. The trusts created under the mortgage rehabilitation statutes were a part of the legislative program designed solely for the benefit of certificate holders as a class. Their protected rights are neither divisible nor separable. (*Matter of Morgan*, 277 N. Y. 203; *Matter of New York Tit. & Mtge. Co.*, 257 App. Div. 19, 281 N. Y. 829; *Munson* v. *Syracuse, G. & C. R. R. Co.*, 103 N. Y. 58; *Wendt* v. *Fischer*, 243 N. Y. 439; *Matter of Lawyers Westchester Mtge. & Tit. Co.*, 176 Misc. 435, 262 App. Div. 878, 288 N. Y. 40; *Title Guar. & Trust Co.* v. *Mortgage Comm.*, 273 N. Y. 415; *Matter of Lawyers Mtge. Co.*, 157 Misc. 813, 248 App. Div. 715, 272 N. Y. 554; *Meinhard* v. *Salmon*, 249 N. Y. 458; *Globe Woolen Co.* v. *Utica Gas & Elec. Co.*, 224 N. Y. 483; *Matter of Lawyers Westchester Mtge. & Tit. Co.* [*Herman*], 253 App. Div. 895, 278 N. Y. 593; *City Bank Farmers Trust Co.* v. *Cannon*, 291 N. Y. 125.)

*Charles H. Tuttle* and *Lewis L. Fawcett* for respondents and appellants. The holders of the purchased certificates owned both the legal and equitable title thereto, without fiduciary obligation to any other holder. They had an absolute right to sell. The certificates were not held by any one in trust, and were not a claim adverse to the trust *res,* which was the mortgaged property — the hotel. The purchases were not from the trustee or the objectants, but from offering brokers in the open market, and fully recorded in the firm's name on the trustee's transfer books. Neither the trust estate nor the present certificate holders suffered any damage. (*Fischer* v. *Guaranty Trust Co.,* 259 App. Div. 176, 285 N. Y. 679; *Donnelly* v. *Consolidated Inv. Trust,* 99 F. 2d 185; *Victor* v. *Hillebrecht,* 405 Ill. 264, 339 U. S. 980; *Brown* v. *Cooper,* 62 Tenn. 153; *American Bank & Trust Co.* v. *Lebanon Bank & Trust Co.,* 28 Tenn. App. 618; *Anderson* v. *Fry,* 123 App. Div. 46, 194 N. Y. 515; *Hooker* v. *Midland Steel Co.,* 215 Ill. 444; *Bawden* v. *Taylor,* 254 Ill. 464; *Union Pacific R. R. Co.* v. *Credit Mobilier,* 135 Mass. 367.)

FROESSEL, J. This proceeding was initiated in July, 1948, by application of a so-called Schackno Act trustee (L. 1933, ch. 745) for an order (a) settling his final account; (b) granting an allowance to him and his attorneys, and (c) granting other related relief. The trustee was appointed in 1935 for the benefit of holders of first mortgage certificates on the Half Moon Hotel in Coney Island, and he operated the property until 1947, when said hotel was sold for $855,000. When the trustee made the present application, appellants-respondents, certificate holders, opposed the granting of any fee to his attorneys on the basis that, by having purchased certificates, said attorneys forfeited the right to be compensated for their services. The question of their right to compensation, however, is not before us on these cross appeals.

Special Term, Kings County, referred the matter to an official referee to hear and report. It thereafter approved the referee's report and ordered that the trustee's attorneys:

"(a) Deliver and surrender to Walter McMeekan, Trustee for Certificate Holders in the issue specified in the caption, all mortgage certificates held by them in said issue.

" (b) Deliver to Walter McMeekan, Trustee aforesaid, a statement duly acknowledged, giving the face amount and the time of purchase of all certificates purchased by them and the actual amount paid for said certificates, and at the same time pay to the Trustee the amount they received on said certificates by the three distributions heretofore made by the Trustee, less the cost to them of the acquisition of such certificates as may be shown on their statement, together with interest at the rate of six (6%) percent per annum on each amount that was due on the date of each of the said three distributions to the date of payment to the Trustee ".

The order further directed that all remaining questions relevant to the settlement of the trustee's account, his commissions and attorneys' allowance be held in abeyance until the order had been complied with, and that upon compliance the referee should continue the hearing and make further report. The Appellate Division (one Justice dissenting), modified the Special Term order by striking out subparagraphs " a " and " b " above referred to, ordered that those former certificate holders from whom the trustee's attorneys purchased certificates be brought in as parties, and that they be given notice of the possibility of their ownership of claims against said attorneys with reasonable opportunity to assert such claims, if any. That court also remitted the matter to Special Term for further proceedings in accordance with its opinion, obviously because it was not satisfied upon the record before it whether the attorneys had observed the rule of full disclosure to the beneficiaries with whom they were dealing.

The objecting certificate holders have obtained leave from the Appellate Division to appeal on the certified question: " Was the order of the Special Term properly made? ", and the trustee and his attorneys similar leave on the question: " Was the order of the Appellate Division properly made? ".

The Half Moon Hotel was constructed in 1928 and 1929 at an alleged cost of over $2,500,000. The Title Guarantee and Trust Company issued first mortgage participation certificates in a mortgage in the sum of $690,000 covering the premises. The Bond and Mortgage Guarantee Company guaranteed the payment of the bond secured by the aforesaid mortgage to the owners and holders of said bond and mortgage and/or

participating certificates therein. The business and property of Bond and Mortgage Guarantee Company were taken over by the Superintendent of Insurance in 1933, pursuant to the provisions of article XI (now art. XVI) of the Insurance Law, and the Mortgage Commission of the State of New York took over the mortgage investments. The Superintendent of Insurance thereupon sought and obtained judicial approval of a plan for readjustment, modification and reorganization of the rights of the holders of the guaranteed mortgage participation certificates. In pursuance of this plan, the Mortgage Commission foreclosed the mortgage, and title to the Half Moon Hotel was transferred to the trustee.

The order of the Supreme Court, Kings County, dated October 7, 1935, provided, among other things, that " Walter McMeekan shall be appointed Trustee by the Court *of all of the property of every description securing or intending to secure the certificates issued by Title Guarantee and Trust Company against the mortgage which is the subject-matter of this proceeding* and guaranteed by Bond and Mortgage Guarantee Company. * * * Upon the execution of the said Declaration of Trust, the Trustee shall become vested with title to the said trust estate and shall hold the same in trust *for the benefit of certificate holders solely to liquidate the same in an orderly businesslike manner* ". (Emphasis supplied.) This was done pursuant to chapter 745 of the Laws of 1933, as amended (McKinney's Unconsol. Laws, § 4871 *et seq.*). The purpose of this legislation was to prevent demoralization of the general real estate market under the economic pressure of the depression, with consequent ruin to real estate owners and damage to investors; it sought to provide a method of disposing of these mortgages in an orderly manner over a reasonable period of time (*Matter of People [Tit. & Mtge. Guar. Co.]*, 264 N. Y. 69, 85). Chapter 19 of the Laws of 1935 created the Mortgage Commission of the State of New York. In section 1 thereof a public emergency affecting the health, safety and comfort of the people was declared, the enactment providing: " Many holders of mortgage investments are receiving no income or little income therefrom and they and their families are in want. The present market for such mortgage investments has depreciated to such an extent that few of such mortgage investments

can be sold except at great sacrifice and at distress prices.''
By section 3 of chapter 944 of the Laws of 1939 (McKinney's
Unconsol. Laws, § 4846), the Mortgage Commission was ter-
minated and its powers transferred to the Superintendent of
Insurance.

The hotel had been operated by a receiver for two and a
half years before the trustee took possession in December, 1935.
The attorneys for the trustee have acted as such since that
time.  Between September 25, 1941, and June 21, 1944, the
attorneys made a total of five purchases of certificates of the
face amount of $47,489.42 at a cost of $3,995.42, or on the
average less than 8½ cents on the dollar.  On July 1, 1946,
they purchased additional certificates in the face amount of
$9,000 for which they paid $5,040.  Thus their total average
cost was less than 16 cents on the dollar.  Distributions thus
far made have amounted to nearly 56 cents on the dollar, and
the attorneys' profit has amounted to well over $22,000.  In
addition, the attorneys have received thus far over $10,000 for
their legal services, and on the present accounting request
approximately an additional $25,000.  The objecting·certificate
holders purchased their certificates of the face value of some
$103,000 at various times in 1939, 1941, 1942, 1944, 1946 and
1947 at an average price of more than 43 cents on the dollar.

There is no claim of actual fraud, bad faith, or manipulation
of the trust dealings by the attorneys.  The attorneys assert
they did not buy any of the certificates from certificate holders;
they bought from dealers and brokers only.  They bought in
their own name without attempt at concealment.  The attorneys
stated they never solicited certificates for sale either from cer-
tificate holders or brokers.  They also state that they did not
rely on any '' inside or secret information '' in buying the
certificates.  Of course, by reason of their situation, they could
not help but have the fullest information concerning the trust.
The attorneys also claimed that in response to many inquiries
from certificate holders, they always advised them to hold on
rather than to sell at the then depressed market values.  It
does not appear, however, that the attorneys informed such
holders that they were buying certificates, nor how many
inquired.

The trustee knew about the attorneys' purchases because, after a sale was completed, the certificate was sent to him for transfer. He stated that " they had a perfect right to do it ", although neither he nor any of his family directly or indirectly participated in any purchases. However, it is stated in the referee's report — and undisputed here — that the attorneys " admit their dealings in certificates were never disclosed in any way to the judges who made the allowances to them for services or to the justices in charge of reorganization and rehabilitation matters with whom they were frequently in contact as set forth in their detailed claim for fees."

We are of the view that the attorneys did breach their fiduciary obligation. The duty of the trustee, as defined by court order, was to hold the hotel in trust " for the benefit of certificate holders solely to liquidate the same in an orderly businesslike manner ". One of the most fundamental duties of a trustee in any case is complete unselfishness and inflexible loyalty to the interests of the beneficiaries of the trust. This duty stems from human frailty when confronted with conflicting interests, evidenced by the centuries-old scriptural passage: " No man can serve two masters ".

The attorneys, concededly in the same position as the trustee, owed an equally high degree of fidelity, and so both courts below held, the Appellate Division stating that, " by reason of their status as attorneys for the trustee, [they] were no less fiduciaries than was the trustee himself." (277 App. Div. 1132.) Thus the attorneys, like the trustee, owed to these certificate holders " the duty of the finest loyalty ", " something stricter than the morals of the market place " (*Meinhard* v. *Salmon,* 249 N. Y. 458, 463–464). The attorneys put themselves in a position " in which *thought of self was to be renounced,* however hard the abnegation "; their loyalty to the certificate holders was to be " *undivided and unselfish* "; indeed, for them this " *rule of undivided loyalty* " was " *relentless and supreme* " (*Meinhard* v. *Salmon, supra,* pp. 467, 468, emphasis supplied; see, also, *Case* v. *Carroll,* 35 N. Y. 385, 388; *Merrick* v. *Waters,* 51 App. Div. 83, affd. 171 N. Y. 655, and, more recently to the same effect, *City Bank Farmers Trust Co.* v. *Cannon,* 291 N. Y. 125, 131; *Matter of Durston,* 297 N. Y. 64).

Moreover, the question of bad faith or damage is irrelevant to our inquiry. As was said in *Wendt* v. *Fischer* (243 N. Y. 439, 443-444): "we are told that the brokers acted in good faith, that the terms procured were the best obtainable at the moment, and that the wrong, if any, was unaccompanied by damage. This is no sufficient answer by a trustee forgetful of his duty. The law 'does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case' (*Munson* v. *Syracuse, etc., R. R. Co., supra* [103 N. Y. 58], at p. 74; cf. *Dutton* v. *Willner,* 52 N. Y. 312, 319). Only by this uncompromising rigidity has the rule of undivided loyalty been maintained against disintegrating erosion."

Measured by these standards, we think it clear that these attorneys placed themselves in a situation wherein their own personal purposes *might* well conflict with the purposes of the trust beneficiaries, the certificate holders. Countless illustrations of such conflict suggest themselves on slight reflection. In every detail of legal advice and legal action with respect to the trust estate, the attorneys would consciously or unconsciously have in mind their own investment in the trust property. If all went well, the difficulty might not be great, but if the trust estate were in great danger, and the market price of certificates again began to decline, the temptation to protect themselves with respect to their own investment would have a tendency to affect their best judgment, advice and action. They would find it difficult to obliterate a divided loyalty, and the endangering process of "disintegrating erosion" would quickly present itself. Hence the uncompromising rigidity of the rule, and it applies irrespective of good or bad faith. There is no shadowy borderline or twilight zone. Where doubt exists, full and complete disclosure, and authorization from the court upon due notice, are the fair and simple remedies.

That the attorneys could have influenced the course of the liquidation is too plain for controversy; indeed, they could not help but influence it in one way or another, as evidenced by the affidavit of one of the attorneys in connection with the

negotiations surrounding the Navy lease. The same affidavit discloses that the attorneys, when several prospects indicated an interest in buying the hotel, were " continuously consulted [by the trustee] * * * as to the manner of procedure, the type of contracts to be entered into, the terms of any sale and other related matters." How could the attorneys give an absolutely unbiased opinion on such matters when their own profits and losses were involved? That their advice and action in this case may have been correct, despite their personal interest in the trust estate, is beside the point. In another case it may be otherwise. The law cannot always discover and measure the influence of a trustee or his attorneys. The basic vice is the existence of a personal interest, entangling their private claims with those of their beneficiaries, thus creating the danger of biased judgments and opening the way to fraud and wrong. That is sufficient to brand this conduct as a breach of fiduciary obligation under the circumstances here presented (see 3 Bogert on Trusts and Trustees, part 1 [1946], § 485, p. 108; § 543, pp. 375, 379, 380; § 544, p. 399; 2 Scott on Trusts, [1939], § 170.21, subd. [2], pp. 899–901; Restatement, Trusts, § 170, particularly comment j; Restatement, Restitution, § 196).

In *Matter of Dwight* (61 App. Div. 357, appeal dismissed 173 N. Y. 583) it was held that where the attorney for the assignee for the benefit of creditors, acting in the interest of the assigned estate, induces creditors thereof to execute assignments of their claims to him, paying personally therefor an amount less than their face value, he is only entitled to be allowed out of the assigned estate the amount paid by him for the claims, with interest. At page 362 the court said: " To allow a trustee and his attorney to take advantage of their trust relation and their special knowledge by reason of such relation to make an individual profit out of the trust fund is contrary to public policy." It quoted at length with approval from *Manhattan Cloak & Suit Co.* v. *Dodge* (120 Ind. 1, Note, 6 L. R. A. 369), where a situation similar to the *Dwight* case (*supra*) was presented.

The attorneys rely largely on *Donnelly* v. *Consolidated Inv. Trust* (99 F. 2d 185) and *Victor* v. *Hillebrecht* (405 Ill. 264, certiorari denied 339 U. S. 980), the only two cases cited by the Appellate Division herein. The *Donnelly* case (*supra*)

involved trustees' purchases of shares of a Massachusetts trust at a time apparently when the trust was a going concern and not under judicial supervision. The court pointed out that a Massachusetts trust resembled a corporation, " the trustees being analogous to directors and the shareholders to corporate stockholders " (p. 186). (See, on the question of directors and officers of a corporation purchasing its stock, *Fischer* v. *Guaranty Trust Co.*, 259 App. Div. 176, affd. 285 N. Y. 679.) Such a situation is not comparable to the one now before us. Moreover, it appeared in the *Donnelly* case that one of the trustees caused letters to be sent to *all* shareholders advising them not to sell; no such all-inclusive admonition was given in the instant case. Certainly the disclosure made by the attorneys here, " so indefinite and equivocal " as it was, did not meet the test that, where dual interests are to be served, " the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance " (*Wendt* v. *Fischer*, 243 N. Y. 439, 443, *supra*; see 3 Bogert on Trusts and Trustees, part 1 [1946], [commenting that the *Donnelly* decision " seems of dubious soundness "], § 485, p. 109, n. 91).

In *Victor* v. *Hillebrecht* (*supra*), also relied upon by the attorneys and the Appellate Division, purchases were made by trust managers under a liquidation trust agreement which appointed both trust managers and a liquidation trustee. There, however, the trust agreement provided: " Trust Managers, may, but need not, be holders of participation certificates. The rights of any holder of participation certificates to deal freely with Liquidation Trustee and Trust Managers shall not be affected by his being a Trust Manager." (See 3 Bogert on Trusts and Trustees, part 1 [1950 Cumulative Pocket], § 544, n. 24.)

In any event, to the extent that the *Donnelly* and *Victor* cases (*supra*) may be construed as imposing a less rigid duty upon trustees, we are not disposed to follow them. In our State " Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the ' disintegrating erosion ' of particular exceptions " (*Meinhard* v. *Salmon*, *supra*, p. 464). We have taken this unyielding position because of a belief that only thus can the " level of conduct for fiduciaries " be kept " higher

than that trodden by the crowd ", and we have stated that this higher level " will not consciously be lowered by any judgment of this court "; we should not lower it now, and thus make the first breach in a " tradition that is unbending and inveterate " (*Meinhard* v. *Salmon, supra,* p. 464; see, also, *Munson* v. *Syracuse, G. & C. R. R. Co.,* 103 N. Y. 58, 74, *supra*). And certainly not in a judicial proceeding, authorized by the Legislature to relieve distressed holders of mortgage investments, who can no longer act independently. By virtue thereof, the Supreme Court was given complete supervisory powers to assist in preserving the trust estate for their benefit, and the Superintendent of Insurance and the State Mortgage Commission were empowered to make financial advances. This emergency legislation was not enacted to assist trustees or their attorneys to make private profits from the trust estate by purchasing for themselves mortgage certificates with the right to vote and act that accompanied them.

The distinction sought to be made between the trust property and the certificated interests in the mortgage is without substance. By foreclosure of the mortgage, the certificate holders became the beneficial owners of the property in place of the foreclosed mortgage, and the trustee holds the fee title for them pursuant to court order. The certificate holders are to all intents and purposes the owners of the property and the clients of the trustee's attorneys. The latter look to them for compensation out of their interest in the property. The attorneys bought such interests *in the trust estate,* in the administration of which they were under a duty to assist. The trust corpus was owned by the certificate holders, there was but one trust to be administered, and dual interests could not be served. (Cf. U. S. Code, tit. 11, § 649; Real Property Law, § 127, subd. 1.)

We agree with the Appellate Division's order insofar as it directs that the former certificate holders from whom the attorneys purchased certificates be brought in and given notice of the possibility of their ownership of claims, and insofar as it remits the matter to Special Term for further proceedings. However, we do not agree with the Appellate Division insofar as it struck out Special Term's direction that the attorneys' certificates be delivered and surrendered to the trustee, and that their profits be accounted for. As we see it, the attorneys

in no event may keep the certificates and the profits, but must account therefor to the trust estate as upon a constructive trust, subject to the rights of the former certificate holders.

The order of the Appellate Division should be modified by striking out the direction in the first decretal paragraph thereof, and by reinstating in lieu thereof subdivisions " a " and " b " of the third decretal paragraph of the Special Term order, excepting as to the time of compliance, and the matter remitted for further proceedings not inconsistent with this opinion, and, as so modified, affirmed, without costs. The certified questions should be answered in the negative.

LOUGHRAN, Ch. J., LEWIS, CONWAY, DESMOND, DYE and FULD, JJ., concur.

Ordered accordingly.