POIRIER & MCLANE CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2662-72.     Filed March 10, 1975.

*Edward S. St. John* and *Thomas P. Dougherty,* for the petitioner.

*Rufus H. Leonard, Jr.,* for the respondent.

### OPINION

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for 1964 in the amount of $624,485.37. Some of the issues have been settled, and the sole issue remaining for decision is whether petitioner is entitled to a

deduction for 1964 under section 461(f) [1] for the amount of funds transferred in trust under an instrument reciting that the sole purpose of the transfer was to provide funds for the payment of certain obligations as finally determined in pending litigation. The answer depends, more specifically, upon (1) whether the funds were placed beyond petitioner's control pending the settlement of the claims, and (2) whether the trust instrument was defective in that it was not signed by the persons asserting liability against petitioner.

All the facts are stipulated.

During the tax year in issue, petitioner Poirier & McLane Corp. (hereinafter petitioner), whose principal offices were located in Yonkers, N. Y., was a New York corporation engaged in the building of highways, viaducts, and tunnels. Petitioner prepared its income tax returns on the basis of the calendar year, employing the accrual method of accounting.

In January 1956, petitioner entered into a contract with the New York City Transit Authority to reconstruct a subway tunnel and to enlarge a subway station in the Borough of Brooklyn, New York City. Under the contract, petitioner was obligated to hold the New York City Transit Authority harmless from all damage claims resulting from the work to be performed.

As a result of petitioner's performance of the work on this project, the Strand Building Corp. brought an action against petitioner for trespass and negligence. Actions for claimed damages and loss of revenue also were brought by several tenants of other properties located at the construction site. The combined amount of the damages claimed by these plaintiffs was $581,150.

In October 1958, petitioner entered into a contract with the State of New York as general contractor for the construction of a parkway in Yonkers, N. Y. Under this contract, petitioner was required to hold the State of New York harmless from all damage claims resulting from the work performed under the contract. To install the necessary pilings, petitioner employed Raymond Concrete Pile Co. (Raymond) as a subcontractor. Subsequently, during the driving of these pilings, an adjacent apartment building owned by Bronxville-Palmer, Ltd. (Bronxville), was alleged by Bronxville to have been damaged. In 1960, Bronxville brought actions against the State of New York, petitioner, and

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

Raymond, seeking damages of $14,200,000 for trespass and negligence allegedly arising from pile drivings which trespassed upon Bronxville's property, thereby permanently damaging the foundation and structure.[2]

The carrier of petitioner's liability insurance informed petitioner that its policies did not cover damages arising out of trespass, but that the carrier would undertake to defend all the above-mentioned actions because of the allegations of negligence.

On December 31, 1964, petitioner entered into an agreement, described below, with the Manufacturers Hanover Trust Co., as trustee, to hold United States Treasury bills and a certificate of deposit for the purpose of the payment of obligations expected to arise out of the litigation outlined above. Establishment of the reserve was prompted by advice given petitioner by its counsel, insurance carrier, and accountant.

The amount of the reserve was determined as follows:

| Plaintiff | Amount of claim | Amount of reserve |
|---|---|---|
| Strand Building Corp., et al. | $581,150 | $200,000 |
| Bronxville | 14,200,000 | 900,000 |
| Total | | 1,100,000 |

Petitioner's agreement of December 31, 1964, with the trustee stated that petitioner, designated as settlor, had transferred a certificate of deposit and Treasury bills to the trustee to be held in trust "for the sole purpose" of the payment of petitioner's obligations expected to arise out of the litigation pending against petitioner as a result of the two construction jobs. The agreement listed by name the corporations and individuals who had filed the suits to which the agreement referred. The agreement provided in pertinent part:

2. The principal and all accumulated interest and earnings shall be held by the Trustee for the sole purpose of the payment of the obligations of the Settlor which may arise out of litigation pending against the Settlor as a result of work performed by it in the construction of the Sprainbrook Parkway in the County of Westchester, State of New York and in the DeKalb Avenue subway reconstruction in the Borough of Brooklyn, County of Kings wherein judgments are demanded against the Settlor and others for damages alleged to have been sustained by the owners and operators of properties adjacent to the places at

---

[2] Pertinent reported decisions in the Bronxville litigation include: 224 N.Y.S.2d 524 (Westchester County Sup. Ct. 1961); 25 App.Div.2d 709, 268 N.Y.S.2d 727 (3d Dept. 1966); 18 N.Y.2d 560, 277 N.Y.S.2d 402 (1966); 34 App.Div.2d 714, 309 N.Y.S.2d 672 (3d Dept. 1970); 36 App. Div.2d 10, 318 N.Y.S.2d 57 (3d Dept. 1971); 36 App.Div.2d 647, 318 N.Y.S.2d 412 (3d Dept. 1971); 30 N.Y. 2d 760, 333 N.Y.S.2d 422 (1972).

which the work was performed. The claims and suits to which this agreement refers are those brought against POIRIER & McLANE CORPORATION by BRONXVILLE PALMER, LTD., STRAND BUILDING CORPORATION, DeKALB AVENUE RESTUARANT [sic], INC., ROSE DRINKS, INC., GAVARES SERVICE STATION & GLASS WORKS and HENRY A. DuFLON, JEANNE DuFLON CREED & DOROTHY DuFLON SHAFFER.

3. The Trustee shall make such payments out of the corpus of the trust as are required to satisfy and discharge the obligation and responsibility of the Settlor to the plaintiffs or claimants in such litigation, whether by settlement or by judgment and to obtain funds for such purpose the Trustee may sell securities invested in accordance with Paragraph 1. hereof.

4. A request by the Settlor for the issuance of a check or checks payable to a plaintiff or claimant shall be sufficient to empower the Trustee to make the payment.

5. The Trustee shall deliver to the Settlor the balance of the fund remaining after the disposition of the claims on the statement of the Settlor that the claims, for the satisfaction of which this transfer has been made, have been determined and disposed of.

\* \* \*

7. The Trustee may rely and shall be protected in acting or refraining from acting upon any written notice, instruction or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the suitor.

8. The Trustee shall not be liable for any action taken by it in good faith and believed by it to be authorized or within the rights or powers conferred upon it by this Agreement, and may consult with counsel of its own choice and shall have full and complete authorization and protection for any action taken or suffered by it hereunder in good faith and in accordance with the opinion of such counsel.

\* \* \*

13. This trust has been executed and delivered pursuant to the provisions of Section 461-f of the 1964 Revenue Act, in the State of New York and it shall be governed by the laws of that state.

The trust agreement was not signed by the claimants mentioned in it. Relying on section 461(f), petitioner deducted on its income tax return for 1964 the amount of the funds transferred to the trustee.

The litigation brought by Bronxville, which included numerous claims, commenced in 1960. On September 8, 1969, after trial of the claims, the New York State Court of Claims awarded damages to the plaintiff in the sum of $11,600, plus interest, for negligence on the part of the State.[3] This amount was

---

[3] Subsequently, the Sept. 8, 1969, judgment of the New York State Court of Claims was modified on questions relating to suspension of interest (34 App.Div.2d 714, 309 N.Y.S.2d 672 (3d Dept. 1970); 30 N.Y.2d 760, 333 N.Y.S.2d 422 (1972)), tolling of the statute of limitations (36 App.Div.2d 647, 318 N.Y.S.2d 412 (3d Dept. 1971)), and the measure of

apparently covered by petitioner's insurance against negligence.

In October 1969, petitioner and its counsel notified the trustee that all claims referred to in the trust agreement were disposed of and that none of the plaintiffs had any present claim against petitioner for damages arising out of the two projects or for any other cause of action whatsoever. Petitioner requested return of the trust principal, plus any interest earned. The full amount of the principal of the trust, plus interest, less trustee fees, was returned to petitioner in November 1969. These amounts were not included in petitioner's income on its 1969 income tax return.

Respondent disallowed petitioner's accrual of the reserve transferred to the trustee, determining that the accrual failed to comply with section 461(a) [4] and, alternatively, that petitioner's transfer did not meet the requirements of section 461(f).

Under the accrual method of accounting, which petitioner used, an expense is deductible for the taxable year in which "all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." Sec. 1.461-1(a)(2), Income Tax Regs.; *Dixie Pine Co. v. Commissioner*, 320 U.S. 516 (1944). Notwithstanding this rule, however, the Internal Revenue Service generally took the position, prior to 1961, that the payment of a contested liability resulted in the item being considered deductible even though it was still contested. In 1961, the Supreme Court decided *United States v. Consolidated Edison Co.*, 366 U.S. 380 (1961), holding that a contested tax, though paid, does not accrue as a deduction for income tax purposes until the contest is terminated. The Court reasoned that, as long as the contest persists, all events determining the fact and amount of the liability have not occurred.

---

damages (36 App.Div.2d 10, 318 N.Y.S.2d 57 (3d Dept. 1971)). As a result of the last-mentioned action, the New York State Supreme Court, Appellate Division, increased the award of damages to Bronxville from $11,600 to $14,204.36 on Feb. 10, 1971. While litigation technically continued after Sept. 8, 1969, the essential merits of the claims were resolved on that date. Moreover, the primary reason for establishing the reserve had been to provide funds to cover possible obligations arising under claims for trespass, a cause of action for which petitioner was not insured.

[4] SEC. 461. GENERAL RULE FOR TAXABLE YEAR OF DEDUCTION.

(a) GENERAL RULE.—The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income.

The effect of the *Consolidated Edison* decision, denying a taxpayer a deduction for contested items that have been paid, was to thwart the objective of matching receipts and disbursements attributable to specific taxable years. Believing that "allowing the deduction of items in the year paid, even though they are still being contested in the courts or otherwise, more realistically matches these deductions up with the income to which they relate than would the postponement of the deduction * * * until the contest is settled," S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964-1 (Part 2) C.B. 505, 604, Congress adopted section 461(f) in 1964, which is as follows:

(f) CONTESTED LIABILITIES.—If—

(1) the taxpayer contests an asserted liability,

(2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability,

(3) the contest with respect to the asserted liability exists after the time of the transfer, and

(4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year),

then the deduction shall be allowed for the taxable year of the transfer. This subsection shall not apply in respect of the deduction for income, war profits, and excess profits taxes imposed by the authority of any foreign country or possession of the United States.

Although *Consolidated Edison* dealt with disputed tax liabilities, it will be noted that section 461(f) refers to any asserted liability. Moreover, the section deals not only with liabilities which have been paid but also with the transfer of money or other property "to provide for the satisfaction of the asserted liability." The accompanying Senate report (S. Rept. No. 830 (Part 2), 88th Cong., 2d Sess. (1964), 1964-1 (Part 2) C.B. 700, 746), explains that: "A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property to the person who is asserting the liability, or by a transfer to an escrow agent provided that the money or other property is beyond the control of the taxpayer." The objective was to allow deductions for sums transferred to pay such asserted liabilities in the year in which the related income was earned rather than in some later year when the contest over such liabilities was settled—"to realistically and practically match receipts and disbursements attributable to specific taxable years."

S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964-1 (Part 2) C.B. 505, 604.

In the instant case, petitioner was contesting the suits of various claimants and, on the advice of counsel, transferred $1,100,000 to the Manufacturers Hanover Trust Co. to be held in trust "for the sole purpose" of the payment of any obligations ultimately determined in those suits. The trustee was authorized to make such payments to the designated claimants out of the corpus as were required to satisfy the obligations of petitioner and, "after the disposition of the claims," to return the balance to . petitioner. As the subsequent events unfolded, petitioner successfully defended the lawsuits. All the money was returned to petitioner in 1969,[5] but there is no question as to the bona fides of the claims against petitioner or the transfer to the trustee. Indeed, the parties have stipulated that the $1,100,000 "reserve was set up by petitioner on the advice of * * * [its] counsel, insurance carrier and accountants." We think these facts demonstrate that the transfer meets the requirements of section 461(f).

Respondent contends that the entrusted funds were not transferred "beyond the control" of petitioner and that the transfer, therefore, does not meet the requirements of section 461(f) as amplified by section 1.461-2(c)(1), Income Tax Regs.[6] In support of this argument, respondent argues that the paragraphs of the trust agreement quoted above reserved to

[5] Although the amount returned to petitioner was not reported as income on its 1969 income tax return, as contemplated by sec. 1.461-2(a)(3), Income Tax Regs., petitioner agrees on brief that, upon a resolution of this issue in its favor, it will file an amended return reporting it as income in that year.

[6] Sec. 1.461-2 Timing of deductions in certain cases where asserted liabilities are contested.

(c) *Transfer to provide for the satisfaction of an asserted liability*—(1) *In general.* A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property beyond his control (i) to the person who is asserting the liability, (ii) to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability) that the money or other property be delivered in accordance with the settlement of the contest, or (iii) to an escrowee or trustee pursuant to an order of the United States, any State or political subdivision thereof, or any agency or instrumentality of the foregoing, or a court that the money or other property be delivered in accordance with the settlement of the contest. A taxpayer may also provide for the satisfaction of an asserted liability by transferring money or other property beyond his control to a court with jurisdiction over the contest. Purchasing a bond to guarantee payment of the asserted liability, an entry on the taxpayer's books of account, and a transfer to an account which is within the control of the taxpayer are not transfers to provide for the satisfaction of an asserted liability. In order for money or other property to be beyond the control of a taxpayer, the taxpayer must relinquish all authority over such money or other property.

petitioner "the right to revoke or terminate this trust at will" by "means of a mere statement that these claims had been determined and disposed of." He reads the above-quoted paragraph 7 of the agreement as relieving the trustee "of any obligation to look behind the contents of the statement submitted by the settlor." On this ground, respondent maintains that petitioner remained the absolute owner of the entrusted funds so far as the rights of creditors are concerned, citing *City Bank Farmers Trust Co. v. Cannon,* 291 N.Y. 125, 51 N.E.2d 674 (1943).[7]

The trust instrument is certainly not a model of clarity, but we do not think the trust was subject to revocation by petitioner. An analysis of the instrument, quoted in pertinent part above, shows that it placed the entrusted funds beyond the control of petitioner until the enumerated claims were settled. Paragraph 2 of the instrument states that the funds were to be held by the trustee for the "sole purpose" of the payment of petitioner's obligations in the pending suits by named claimants instituted in connection with the two construction jobs. Those claimants became beneficiaries of the trust, and petitioner became a contingent remainderman, entitled to the balance remaining after the disposition of the claims.

To make the purpose of the trust even more explicit, paragraph 3 authorized the trustee to make payments "required to satisfy and discharge the obligation and responsibility" of petitioner to the plaintiffs in such litigation. No other payments from the trust fund were authorized. Paragraph 4 provided that a request by petitioner for the issuance of a check or checks payable to a claimant would be sufficient to empower the trustee to make such a payment. Significantly, this authorization refers only to payments to a claimant, i.e., a beneficiary of the trust.

Paragraph 5, on which respondent relies to contend that the trust was revocable, merely provided that the trustee would deliver to petitioner "the balance of the fund remaining after the disposition of the claims." The mechanics for the release of the funds "after the disposition of the claims" was a statement by petitioner that all claims had been "determined and disposed of."

---

[7] N.Y. Est., Powers & Trusts Law sec. 10-10.6 (McKinney 1967), formerly N.Y. Real Prop. Law sec. 145 (McKinney 1945), is as follows:

"Where a creator reserves an unqualified power of revocation, he remains the absolute owner of the property disposed of so far as the rights of his creditors or purchasers are concerned. L.1966, c.952, eff. Sept. 1, 1967."

As contingent remainderman, petitioner, then and only then, would be entitled to the balance remaining in the fund.

Paragraph 7 does not relieve the trustee of any obligation to look behind any statement presented to it by petitioner, as contended by respondent, but refers rather to a request "believed by it [the trustee] to be genuine and to have been signed or presented by the suitor," i.e., a claimant.[8] Indeed, the reference in paragraph 8 to "action taken by it [the trustee] in good faith and believed by it to be authorized" contemplated that it would consult its own counsel on the payment of the funds and on other problems related to the administration of the trust.

Thus, the only ways in which petitioner could have influenced the handling of the entrusted funds were to request the trustee to make a payment to a claimant-beneficiary, thus carrying out the purpose of the transfer, and to request that the balance be returned after the disposition of the claims, i.e., after the objective of the trust had been accomplished. In administering the trust, the trustee, subject to the supervision of a local court with equity powers, had the normal duties of independent judgment and inquiry, *Mills v. Bluestein,* 275 N.Y. 317, 323, 324, 9 N.E.2d 944, 946 (1937); inflexible loyalty to all the beneficiaries, *In re Bond & Mortgage Guarantee Co.,* 303 N.Y. 423, 103 N.E.2d 721 (1952); and complete neutrality in protecting the respective interests of the claimants as beneficiaries and of petitioner as contingent remainderman, N.Y. Est., Powers & Trusts Law sec. 11-2.1(a) (McKinney 1967), formerly N.Y. Pers. Prop. Law sec. 27-a (McKinney Supp. 1965). In no way could petitioner have reacquired or otherwise controlled the entrusted funds until the purpose of the trust had been achieved. We think petitioner made a genuine transfer of the funds beyond its control within the meaning of section 461(f)(2) as interpreted by section 1.461-2(c)(1), Income Tax Regs., quoted in the margin.

Respondent's second argument is based on that portion of regulations section 1.461-2(c)(1) which states that a taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property beyond his control to an

---

[8] Par. 7 is ambiguous, but the reference to the signature of a *suitor* clearly forecloses respondent's argument that the paragraph relieves the trustee of the necessity of looking behind any statement presented by *petitioner.* The paragraph may have been intended to deal with conflicting claims by the several beneficiary-claimants in case the deposited funds were not adequate to pay the full amount of the judgments awarded.

escrowee or trustee pursuant to a written agreement "(among the escrowee or trustee, the taxpayer, and the person who is asserting the liability)." Since the several claimant-beneficiaries did not sign the trust agreement, respondent contends that the agreement does not comply with the regulations and will not support the claimed deduction. Petitioner argues that the regulation, so applied, is impractical,[9] unreasonable, and invalid in that it adds restrictions and conditions to the statute.

We agree with petitioner that the claimant-beneficiaries' failure to sign the agreement does not disqualify petitioner for the deduction. However, petitioner's position is too broad. The regulation need not be declared invalid. Properly interpreted, the regulation simply does not require the signatures of the claimant-beneficiaries in this case.

Initially, it is pertinent that section 461(f) allows the deduction where, among other things, "the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability." Nothing in this language or its legislative history (S. Rept. No. 830, *supra,* 1964-1 (Part 2) C.B. at 604-605 and 745-748) suggests that the person asserting the liability need sign the transfer agreement.

A trust may be created even though the beneficiary has no knowledge of its creation and has not accepted its benefits. Rarely does a beneficiary sign a trust agreement, and his signature or the lack thereof does not affect the trust's validity. In the case of *In re Prudence Co.,* 24 F.Supp. 666 (E.D. N.Y. 1938), a company, prior to the 1933 "Banking Holiday," sold "Prudence-Bonds" on weekly or monthly installments, and when the purchaser had paid a required amount a bond would be issued. The company, without notifying the purchasers, segregated the installment moneys paid toward the purchase of the bonds for which the payments had not been completed. Holding that the company held the segregated funds as trustee for the creditor-purchasers, even

---

[9] In his opening statement, petitioner's counsel forcefully stated the practical considerations in these words:

"it is completely unreasonable, in an adversary proceeding, to have the claimant a party to that agreement; to have the plaintiff know that there is $1,100,000.00 waiting for it if it can obtain or make a settlement. The probability of collection is always a factor in any settlement that's negotiated in actions of this type. * * *"

From the standpoint of claimants, it may be equally impractical to require them to sign such an agreement lest they thereby implicitly limit their claims at the outset of the litigation to the entrusted amount, which may represent only a fraction of their total claims (e.g., $1,100,000 compared with $14,781,150 in this case).

though they did not know of the segregated funds, the court said (p. 668):

Whether this account is to be treated as a special fund for the benefit of the subscribers or is to be treated as part of the general assets of the debtor, depends upon the effect to be given to the unilateral segregation of the funds in a special account when viewed in the light of all the circumstances. The creation of a trust requires no fixed form or phrase. *The failure to notify the cestui que trust of the creation of the special interest in his favor, does not prevent the creation of a trust.* Steel Cities Chemical Co. v. Virginia-Carolina Chemical Co., 2 Cir., 7 F.2d 280; Sinclair Cuba Oil Co., S. A., v. Manati Sugar Co., 2 F.Supp. 240, D.C.S. D.N.Y.; Rogers Locomotive & Machine Works v. Kelley, 88 N.Y. 234, 235; see Beaver Board Cos. v. Imbrie, 2 Cir., 296 F. 670, 672; 1 Bogert, Trust and Trustees (1935) § 172, p. 502. * * * [Emphasis added.] [10]

Accordingly, the failure of the claimant-beneficiaries to sign the trust agreement did not prevent the creation of a valid trust or add any rights to petitioner as grantor or as contingent remainderman. Upon the creation of the trust, the Manufacturers Hanover Trust Co., as trustee, became obligated to effectuate the purpose of the trust—the payment of the claims against petitioner. N.Y. Est., Powers & Trusts Law sec. 11-2.1 (McKinney 1967), formerly N.Y. Pers. Prop. Law sec. 105 (McKinney Supp. 1965).

Thus, neither section 461(f)(2) nor its legislative history reflects any congressional intent to require a trust agreement executed for the purposes of that section to be signed by the beneficiaries.[11] Indeed, the disputed regulation itself says nothing

---

[10] To these citations on the lack of the necessity to notify the beneficiaries of the creation of a trust may be added numerous others, e.g.: *Woodside Presbyterian Church v. Burden,* 240 App.Div. 43, 269 N.Y.Supp. 682, 687-688 (3d Dept. 1934), appeal dismissed 264 N.Y. 690, 191 N.E. 629 (1934); *In re Sweeney's Estate,* 155 Misc. 461, 279 N.Y.Supp. 927, 930 (Westchester County Surr. Ct. 1935); 1 Restatement (2d), Trusts, sec. 36a (1959); 1 Scott, Trusts, sec. 36 (3d ed. 1967).

[11] While sec. 461(f) is addressed to the problem of the deductibility of contested liabilities rather than to the rights of the taxpayer's creditors, we note that in the instant case, protection of the rights of the claimant-beneficiaries who were to be paid from the trust fund was not affected by their apparent lack of knowledge of the trust's creation. As a practical matter, had judgments been entered ultimately for the plaintiffs, petitioner almost certainly then would have disclosed the trust fund rather than allow a levy to be made on its other property for the payment of those judgments. Under such circumstances, if existence of the trust had not been disclosed voluntarily, petitioner's officers would have been subject to examination as to petitioner's assets, N.Y. Civ. Prac. Law sec. 5223 (McKinney 1963), and the trust fund's creation would have been revealed. On learning of the trust, the claimant-beneficiaries would have been entitled to demand of the trustee all information about the trust and its creation for which they had any reasonable use. Bogert, Trusts and Trustees, sec. 961 (2d ed. 1962); 1 Restatement (2d), Trusts, sec. 173 (1959). This would include an inspection of the trust agreement. *Davidson v. Blaustein,* 247 F.Supp. 225, 227-228 (D. Md. 1965).

about the signatures of the beneficiaries of a trust. As a matter of practice, a trust agreement is rarely signed by a beneficiary. The trust agreement in this case, signed only by petitioner and the trustee, created rights in the claimant-beneficiaries which were exactly the same as they would have been had the beneficiaries signed the instrument. The trustee had the same fiduciary duties and obligations to protect the rights of the claimant-beneficiaries, and the claimant-beneficiaries had the same remedies. Similarly, the rights of petitioner as grantor and contingent remainderman were exactly the same.

In these circumstances, the trust agreement was "among the * * * trustee, the taxpayer, and the person[s] who * * * [were] asserting the liability" to the same extent as it would have been had the claimant-beneficiaries signed the instrument. The imprecise language of the regulation—that the agreement is to be "among" the stated parties—was no doubt adopted in order to include situations like this one where the signatures of the claimant-beneficiaries would add nothing.

We hold that the trust agreement complies with the provisions of section 461(f) and of section 1.461-2(c)(1), Income Tax Regs. Allowance of the deduction will serve the congressional objective of matching deductions with taxable receipts to the extent practicable.[12] To reflect the disposition of other issues,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

FORRESTER, *J.,* concurring: I concur in the result reached by the majority, but think the here critical portion of regulations section 1.461-2(c)(1) should be declared invalid if it is read as requiring the claimant-beneficiary to sign the written agreement.

The Code requires taxpayer to transfer money or property against the asserted liability, and the regulation quite properly requires it placed beyond taxpayer's control by a written agreement. But requiring the signature of the claimant adds nothing to taxpayer's loss of control and at the same time destroys, or at

---

[12] While petitioner ultimately prevailed in the underlying litigation, the question of accrual must be viewed as of the date of the transfer. As noted in the text, there is no suggestion that the transfer in trust was not made in good faith or that it did not reflect a realistic appraisal of petitioner's exposure to liability in the year in which its related earnings became taxable.

least limits and narrows, his rights as remainderman. He is forced into the unnatural posture of admitting and defining his adversary's strength during negotiations with him, thus limiting taxpayer's field for maneuver.

The Code does not require this penalty. If the regulation does it is invalid.

FAY, STERRETT, GOFFE, and WILES, *JJ.,* agree with this concurring opinion.

HALL, *J.* I respectfully dissent. The "transfer" in this case did not meet the literal requirements of Treasury regulations section 1.461-2(c)(1) that a qualifying transfer under section 461(f)(2) must either be made "(i) to the person who is asserting the liability," or "(ii) to an escrowee or trustee pursuant to *a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability)."* (Emphasis added.) The "transfer" therefore cannot qualify unless, as the majority holds, the regulation's requirement was a mere inadvertence or imprecision upon which the Commissioner may not rely, or unless, as Judge Forrester's concurring opinion finds, the regulation is invalid. Being unable to agree with either of these views, I would sustain the deficiency.

As I read the regulation, the Treasury has deliberately construed the statute to prevent a secret trust from qualifying. A trust is usually created by agreement *between* trustor and trustee. The unusual requirement here of the beneficiary's participation is, I believe, of great policy significance and was no mere inadvertence.

In fact, the requirement of participation by the other party to the litigation in a qualifying section 461(f) transfer was even *more* clearly spelled out in the proposed regulation:

A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property *to the person who is asserting the liability, or with the agreement of such person* to an escrowee or trustee to deliver the money or other property in accordance with the settlement of the contest, provided that the money or other property is transferred beyond the control of the taxpayer. [29 Fed. Reg. 9798, 9800 (1964); emphasis added.]

The Commissioner, unfortunately, raised a false issue by contesting this case on the ground that the entrusted funds were not transferred "beyond the control" of the petitioner. If that

were all that the regulation required, I would join the majority opinion. I do not doubt that the taxpayer created a valid trust, or that it placed the assets within the trustee's control pursuant to the terms of the trust instrument. But by no legitimate stretch of syntactical interpretation could there be an agreement *among* three parties which was unknown to one of the three.

Nor am I able to find the regulation invalid. The statute requires a "transfer." That this was not intended to be read entirely literally as covering any kind of transfer, however, is made clear by the committee report, which reads as follows:

A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property to the person who is asserting the liability, or by a transfer to an escrow agent provided that the money or other property is beyond the control of the taxpayer. However, purchasing a bond to guarantee payment of the asserted liability, an entry on the taxpayer's books of account, or a transfer to an account which is within the control of the taxpayer is not a transfer to provide for the satisfaction of an asserted liability [S. Rept. No. 830, 88th Cong., 2d Sess., 1964-1 C.B. (Part 2) 746.]

The statute and committee report make clear that a transfer to the opponent or to an escrow agent will qualify if the property leaves the taxpayer's control. An escrow, of course, presumes two parties with adverse interests as well as a third-party escrow-holder, so that the litigation opponent, inferentially, would at least be aware of any escrow arrangement. The committee report does not, however, appear to anticipate the precise issue raised here—the secret trust in which the taxpayer seeks the benefit of the special deduction without the litigation disadvantage of disclosing his hand to the other party. The regulations do not permit the taxpayer seeking the solace of section 461(f) thus to have it both ways. In my view this construction does not over-reach. In the first place, the legislative history, adequately set out in the majority opinion, and the *Consolidated Edison* case, clearly involved only arrangements known to both parties to the litigation. The secret trust was not adverted to by Congress. Secondly, the apparent lack of explicit congressional familiarity with such a device in a litigation context should be no surprise. There would normally be only one motive, a tax motive, to set up a secret trust. A defendant has too little brotherly solicitude for his opponent to be gratuitously setting up secret trusts for the plaintiff's benefit. Instead of arising in the normal litigation context which Congress adverted to in enacting section 461(f),

the secret trust in the present context is spawned by section 461(f) itself. It is a rare sport, not to be found in nature. It is simply an effort to enjoy the deduction without the effects on one's litigation posture of disclosure. And since virtually any large company is constantly and increasingly beset as defendant with a swarm of lawsuits of varying degrees of merit, the majority's rejection of the regulation's deliberately established prerequisites of the litigation opponent's knowledge and participation in a section 461(f) arrangement opens the door to large-scale avoidance. Deductions will now be subject to being manufactured and timed to please, by the simple expedient of setting aside in secret trusts the amount sought to be deducted, as long as that doesn't exceed the maximum allowable litigation exposure. Little genuine change of business posture is involved, for if the litigation is won, the money will return; if lost the judgment must be paid anyway; in the meantime the secret trustor can enjoy the income, and the litigation opponent is none the wiser. Nothing in the legislative history suggests that Congress intended to establish any such regime, nor does it seem likely that it would have intentionally so legislated. We should resolve doubts in favor of the validity of Treasury regulations. *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496 (1948). I cannot, under the circumstances, find the Treasury remiss in blocking this avenue to facile avoidance.

Section 461(f) was designed to alleviate a hardship created by a taxpayer who under pressure of litigation was forced to lay out cash before becoming entitled to a deduction. It was designed to meet bona fide exigencies of business litigation. The issue facing the Treasury in drafting its regulations was whether the statute should also be construed to permit a taxpayer to thrust himself artificially within its protection through a formalistically perfect arrangement designed for no apparent purpose except qualifying for the deduction, while avoiding the collateral litigation consequences of disclosure to the opponent. I cannot find it beyond the regulatory power for Treasury to decide that such an arrangement would be "an operation having no business or corporate purpose" and to find that "the transaction upon its face lies outside the plain intent of the statute." *Gregory v. Helvering,* 293 U.S. 465, 469, 470 (1935).

RAUM, SIMPSON, and QUEALY, *JJ.,* agree with this dissent.