JOHN J. REYNOLDS et al., Respondents, v. JUDITH SNOW et al., as Administratrices of the Estate of LILLIAN R. SCHWAMM, Deceased, and of the Estate of HARVEY L. SCHWAMM, Deceased, Appellants, et al., Defendant.

First Department, March 15, 1960.

*Frank A. Fritz* of counsel (*Anthony T. Antinozzi* and *Frank A. Fritz, Jr.*, with him on the brief; *Bleakley Platt Walker Hart & Fritz*, attorneys), for appellants.

*Ben Herzberg* of counsel (*Alvin H. Schulman* with him on the brief; *Hays, Sklar & Herzberg*, attorneys), for respondents.

Breitel, J. P. After trial before the court without a jury, plaintiffs recovered judgment impressing a constructive trust on 14,000 shares of the American Trust Company and directing that such shares be delivered to plaintiffs upon the payment by them of the acquisition cost of such shares. Defendants appeal, contending that the decision was against the weight of the credible evidence and that there was error in the admission of evidence and the application of substantive principles of law.

Plaintiffs are a real estate operator and manager, and a lawyer, each with wide interests in business and other affairs. Defendants are the bank and the respective administrators of the estates of Harvey L. Schwamm and his wife, the decedents having died as a result of an airplane accident while the action was pending. The husband was charged in this case with having breached his duty to procure the shares in suit for plaintiffs, and, instead, having purchased them for, or in the name of, his wife. Presently, the original shares are held equally by the estates, 5,000 shares by each, and an additional 4,000 shares are held by Mrs. Schwamm's estate resulting from a recapitalization of the bank.

The judgment should be affirmed.

Involved are the principal shareholding interests and, to a degree, therefore, the management and control of the American Trust Company. This is a small closely held bank, whose stock has been traded over the counter in security houses. Prior to 1955 Harvey L. Schwamm was the president and the holder of a controlling interest in the bank. Schwamm's administration became the subject of sharp criticism by the State Banking Department. So strongly did the department feel about conditions, it placed an examiner in the bank in continuous presence. Before the crucial events in this case, it had made clear that Schwamm must go and his financial domination of the bank end, or else the bank would be taken over by the Superintendent.

Plaintiffs Reynolds and McGrath contend that, in early 1955, they were solicited by Schwamm to invest heavily in the stock of the bank, in order to satisfy the Banking Department's requirement that Schwamm's control be ended and to provide a financial basis for the new interests to assume management of the bank. Some of the negotiations occurred in the presence of one

Richard J. Cunningham and were, in a measure, memorialized in letter-agreements and contemporaneous memoranda.

As a result of the negotiations, Schwamm sold to plaintiffs some of his own shareholdings, gave them options for the purchase of additional shares, and undertook to acquire on their behalf shares held by others with whom Schwamm had intimate and persuasive contact.

At one of the conferences when Cunningham was present, the shareholdings in the bank were analyzed. Prospective allocations were made to provide the McGrath-Reynolds group with shares by purchase which would roughly equal those held by Schwamm, after the latter's holdings had been reduced by sales made and options granted directly to the McGrath-Reynolds group.

In connection with this allocation plaintiffs contend that Schwamm undertook to acquire for them some 10,000 shares directly or indirectly controlled by two men, Goodstein and Rosoff. Schwamm, plaintiffs contend, advised that Goodstein and Rosoff not be approached by the McGrath-Reynolds group but that he, Schwamm, should undertake the negotiations because of his special relationship with these men, or the people whom they represented. Defendants deny this and say there was no such understanding with regard to those specific shares.

What happened was that Schwamm, after approving a press release to the effect that control of the bank had been acquired by the McGrath-Reynolds group, and without disclosure to McGrath or Reynolds, arranged for the purchase of the Goodstein-Rosoff shares in the name of his wife. The agreement with Goodstein and Rosoff provided for deferred payments, and Schwamm personally guaranteed payment. The effect of the purchase was to keep Schwamm in working control of the bank to the exclusion of the McGrath-Reynolds group.

It is undisputed that Schwamm undertook to negotiate various purchases of shares for the McGrath-Reynolds group, and that he made a number of such purchases on their behalf. His undertaking to purchase shares is established, not only by the conversations at which Cunningham was present, but also by a letter Schwamm wrote and signed. Under date of February 14, 1955, he acknowledged receipt from McGrath of payment on account of option shares being taken up. Schwamm added: "I have begun negotiations to acquire another 15,000 shares of American Trust Company stock which I will deliver to you at $15 per share. Although I have not contracted with you to deliver this stock I feel confident of my ability to do so. You realize that if I am successful in this undertaking it will be for immediate

delivery. I spoke to Mr. Cunningham this morning and he informed me that you will be ready to accept delivery on all or any part of these 15,000 shares on very short notice, if immediate cash payment is required." Of the 15,000 shares to which reference is made, Schwamm, concededly, delivered 5,725 [*] shares during February and March, 1955.

Included in the reference, however, according to plaintiffs, were the 10,000 shares in suit. Defendants deny that the Goodstein-Rosoff shares were included, and argue that, in any event, the letter, on its face, shows Schwamm had not "contracted" to deliver them. Plaintiffs argue to the contrary, and in this they were upheld by the trial court. They say the qualification in the letter simply meant that Schwamm was not warranting that he would succeed in purchasing the Goodstein-Rosoff shares but that he was promising, if the expectation of acquiring the shares were realized, the purchase would be made for the account of plaintiffs.

Defendants also make the point that under the letter-agreement shares were to be purchased at $15 per share, and that the Goodstein-Rosoff shares cost $20 per share, thus not being available for allocation to the McGrath-Reynolds group. Plaintiffs argue, however, that the $20 price resulted from the deferment of payment, and that had cash been paid, as they and Schwamm had agreed, the shares would have cost no more than $15 per share, the then market price for the bank shares in large blocks. Smaller lots, they point out, were selling for less than $15 per share.

In January, 1956 plaintiffs brought an action similar to this one against Schwamm, his wife, Goodstein, and Rosoff for the purpose of impressing a constructive trust on the 10,000 shares. At that time the shares were only under contract for purchase by Mrs. Schwamm from Goodstein and Rosoff. The action came on for trial in November, 1956, with defendants in that action pressing for trial, but on December 3, 1956 the action was discontinued, without prejudice, at plaintiffs' request. In the early stages of that action plaintiffs obtained a temporary injunction. The injunction was stayed, and there followed immediately a decisive victory for the Schwamm slate at the annual stockholders' meeting.

Since the discontinuance of the first action, and before the beginning of this one, the McGrath-Reynolds group consolidated and increased its shareholdings, despite the recapitalization of the bank and the ensuing issuance of additional shares. The

---

[*] The discrepant figure of 725 shares has been largely ignored by the parties. Plaintiffs, however, have offered to credit that number of shares on the judgment.

recapitalization had been required by the Banking Department. As a consequence, the balance of control hangs once again upon the ownership of the 10,000 shares, and additional shares resulting from the recapitalization. In this context plaintiffs, in January, 1958, sued anew and sought to impress a constructive trust on the shares.

As it eventuated, Mrs. Schwamm did not acquire the shares in suit until November, 1957. She then sold 5,000 shares to one Davis. After Schwamm's death his son reacquired these shares and they are presently held by the father's estate. Thus, the original Goodstein-Rosoff shares are now held in equal proportions by the estates.

By the time this action came to trial Schwamm and his wife had died. The Schwamm interests, however, continue, through their respective estates, and particularly in the person of Schwamm's son, who is now chairman of the board of the bank.

Serious questions were raised on the trial whether the testimony of McGrath, Reynolds, and Cunningham concerning personal transactions and communications with Schwamm were admissible under section 347 of the Civil Practice Act. The testimony of McGrath and Reynolds was received only against the estate of Mrs. Schwamm. This was on the view that Mrs. Schwamm did not derive her " title or interest " in the shares " from, through, or under " Schwamm who, it was argued, was merely her agent. The testimony of Cunningham was received as against all defendants. But it was argued that his testimony was also barred because of his onetime ownership of 140 shares in the bank and his alliance with the McGrath-Reynolds group. It was also argued that Mrs. Schwamm did not take subject to any breach of duty by her agent, Schwamm, and, therefore, as an innocent purchaser she took free of any encumbering interest.

With respect to the entire case, it is now argued, as noted before, that the weight of the credible evidence does not permit the finding of any agreement with regard specifically to the Goodstein-Rosoff stock and, therefore, the foundation for a constructive trust. It was also urged by defendants that plaintiffs have been guilty of laches. The pivotal fact in support of this defense is the discontinuance of the earlier action and the revival of the claim only after the occurrence of a new opportunity to gain control of the bank. Prejudice is based upon the changes in stock ownership and the death during this action of Schwamm and his wife.

In viewing the evidence, there is little difficulty in finding substantial support for plaintiffs' contentions on the issues of fact.

The letter of February, 1955, alone, is determinative of the obligation created. This is especially true if it be interpreted against the frame of circumstances. Schwamm's was no mere agency. He was undertaking in conjunction with the McGrath-Reynolds group to create a balanced position of shareholdings in the bank. He had induced plaintiffs to invest, eventually, in the neighborhood of $600,000. He had promised them at least a sharing of control of the bank. In his letter he said that he had begun negotiations to acquire for plaintiffs from outside sources an additional 15,000 shares, and that such shares would be delivered to them. This constituted a representation that he was negotiating on plaintiffs' behalf. The ensuing sentence that he had not contracted to deliver the stock is followed immediately by the clause that he felt "confident" of his ability to deliver. Since Schwamm was acting for plaintiffs, the exoneration related only to his inability to negotiate successfully for the shares, if that should eventuate. He went on in his letter to point out that, if he were successful in the undertaking, the arrangement would be for immediate delivery, and that he had been assured by Cunningham that plaintiffs would be ready to accept delivery on short notice, even if immediate cash payment were required. Hence, if the letter-agreement was inclusive of the shares held by the Goodstein-Rosoff group there should be no question about Schwamm's obligation. It was conditional, it is true, but the condition was based upon successful negotiation and the letter-agreement should not be construed as creating merely an illusory promise.

Nor should there be dispute that the reference in the letter included the Goodstein-Rosoff shares. During the negotiations, as shown by Cunningham's contemporaneous memorandum, those shares figured in the deal. They were the only substantial block of shares available at the $15 price. Moreover, the press release, which Schwamm approved, announced that the McGrath-Reynolds group had acquired control by the acquisition of stock from "Schwamm * * * and his Mexican associates", and it was the Mexican associates who, at the time, held the stock represented by Goodstein and Rosoff. Finally, the testimony was that Schwamm told McGrath not to negotiate with Goodstein and Rosoff but to leave it to him.

At this point, it is worthy to observe that whether the objective of the plan was to shift working control from the Schwamm group to the McGrath-Reynolds group is not determinative. Circumstantially, it is evident that the minimum purpose was to place in the McGrath-Reynolds group a stock interest to balance that of Schwamm and accomplish, perhaps, a shared control.

In this way the demand of the department could be satisfied, or so it could be hoped, with respect to financial control. The plan, if realized, could also provide a plausible basis for the McGrath-Reynolds group assuming overt management of the bank. There was no need for complete dispossession of Schwamm's interest, thus keeping alive the possibility of his returning to a position of influence in a better day. Indeed, it was understood that Schwamm's son, already in the bank, would be permitted to remain. This circumstance, and the inferences from it, explain why Schwamm, despite his personal need for a great amount of ready cash, did not provide plaintiffs with all the shares they needed from his own holdings. It also explains why Schwamm bought other shares to supplement the shares he had sold, and was selling, to plaintiffs, by purchases from outside stockholders. It also explains why the McGrath-Reynolds group was ready to invest as much as $600,000 in this much-troubled bank.

In thus analyzing the facts, the testimony of McGrath and Reynolds has been excluded from consideration. And for reasons which will soon be apparent.

The testimony of McGrath and Reynolds was received only as against the estate of Mrs. Schwamm. This was done on the theory, already mentioned, that she did not take her interest in the shares from, through, or under Schwamm (Civ. Prac. Act, § 347). It is true generally, that where the relationship is a relatively·simple one, a principal does not take title or interest from, through, or under his agent (*Jones* v. *Maloney,* 277 N. Y. 437, 439–440; Greenfield, Testimony Under Section 347 Civ. Prac. Act, §§ 58, 154; cf. *Ward* v. *New York Life Ins. Co.,* 225 N. Y. 314).

There is, however, a nice legal question whether the rule is the same where there is more than a simple agency and the transaction is infused with personal obligation assumed by the agent (cf. *Duncan* v. *Clarke,* 308 N. Y. 282; but see *Ward* v. *New York Life Ins. Co., supra*). In this case Schwamm was not a mere agent, but one who was managing the interests of all the members of the Schwamm group in the arrangements to share, or shift, control and ostensible management of the bank to the McGrath-Reynolds group. Both he and his wife had a common interest in Schwamm's maintaining his manipulative position with reference to control of the bank. Moreover, Schwamm guaranteed payment for the shares. Presumably, this guarantee was essential to effecting the transaction.

Actually it is not necessary to decide this nice question. Even if the testimony of McGrath and Reynolds as to personal

transactions with Schwamm be disregarded, there is enough in the proof to sustain plaintiffs' claim. The documents, the press release, the surrounding circumstances, and the testimony of Cunningham suffice.

The same difficulty involved in the application of section 347, however, does not apply to the testimony of Cunningham. While it is true that he once held 140 shares, and his sale of the shares pending the action may be disregarded, it is still true that his interest and his alliance with the McGrath-Reynolds group was both tenuous and remote under the statutory test. The statute requires that the disqualified person be interested "in the event", and this has been construed to mean the very judgment sought in the action. The courts have consistently declined to apply the statutory restriction to remote interests, even when the witness had a distinct interest in the question involved as distinguished from the judgment (*Duncan* v. *Clarke*, 308 N. Y. 282, 285, *supra*, with respect to the testimony of the child's mother in an action for support of the child under an agreement with the child's grandmother; *Talbot* v. *Laubheim*, 188 N. Y. 421; *Hobart* v. *Hobart*, 62 N. Y. 80; Greenfield, *op. cit.*, §§ 30–92; Richardson, Evidence [8th ed.], § 415).

A more difficult problem is whether Mrs. Schwamm and, therefore, her estate, is charged with knowledge of the breach of duty by Schwamm and whether she took her interest in the shares subject to rights in favor of the McGrath-Reynolds group. Generally, an agent's knowledge, and even fraud, is imputed to his principal (*Henry* v. *Allen*, 151 N. Y. 1; *Raines* v. *Moran*, 57 N. Y. S. 2d 800, 807, affd. 270 App. Div. 979; Restatement, Agency 2d, §§ 263, 272, 274; 2 Pomeroy, Equity Juris. [5th ed.], §§ 666–667; 3 C. J. S., Agency, § 262 *et seq.*; 2 N Y Jur. Agency, § 259 *et seq.*). At least such knowledge is imputed so long as the agent is not acting antagonistically to the interest of his principal (*Henry* v. *Allen*, *supra*; *Connecticut Fire Ins. Co.* v. *Commercial Nat. Bank*, 87 F. 2d 968; Restatement, Agency 2d, § 282; 3 C. J. S., Agency, § 269; 2 N. Y. Jur., Agency, § 268).

Defendants mistakenly rely on the general principle found in Restatement of Restitution, section 201, to the effect that a fiduciary who transfers entrusted property to a third person conveys a good title if the transferee had no notice of the breach of duty and was otherwise a bona fide purchaser. The principle is rendered inapplicable because of the rule which imputes knowledge of the agent to the principal. Hence, applying both principle and rule to this case, as one should, Mrs. Schwamm could not qualify as a bona fide purchaser because the knowledge

of her husband is imputed to her (see Restatement, Restitution, § 174, comment d).

There is also the argument that Schwamm was acting as the agent of both plaintiffs and Mrs. Schwamm and, therefore, the imputation of knowledge is offset between the parties, both being equally innocent. This reasoning is unsound. It fails to recognize that plaintiffs were owed a pre-existing obligation by Schwamm to negotiate and acquire the Goodstein-Rosoff shares. Of this obligation Mrs. Schwamm is presumed to have been aware, under the principles of agency just discussed. Thus, when Schwamm purported to act on Mrs. Schwamm's behalf, she is deemed to have known of the conflicting interest. On the other hand, any knowledge imputed to plaintiffs, namely, of the contract in behalf of Mrs. Schwamm, would not be of any prior interest in derogation of their own, but only of a violation of their interest by Schwamm. Hence, the knowledge that might be imputed to plaintiffs because Schwamm was their "agent" was not that of superior interest (see 2 Pomeroy, *op. cit.*, § 667a). But this is largely idle, because as earlier observed, there is no imputation of knowledge to a principal of acts or information at the hands of an agent acting antagonistically to his principal, and that Schwamm was certainly doing with respect to plaintiffs.

Moreover, even beyond the matter of imputed knowledge, there is the salient fact that Schwamm was more than a mere agent for Mrs. Schwamm. He was, indeed, the "manager" of the Schwamm group in exercising control of the bank, and Mrs. Schwamm was simply another member, each of whom had a stake in maintaining Schwamm's manipulative position. For lack of a better term, the Schwamm group was in the nature of a "joint venture" engaged, in this setting, in a further mutual arrangement with the McGrath-Reynolds group for the purpose of realigning the shareholdings and establishing some sort of *modus operandi* for control of the bank, in order to quiet the department. Hence, the Schwamms were more like partners or joint venturers than principal and agent. As such the responsibility of the one is as great as the other (*Spier* v. *Hyde,* 92 App. Div. 467, 472; cf. Partnership Law, §§ 23, 24).

Thus far the relationship between the Schwamms has been discussed as that of principal and agent, or as joint venturers. Actually, they were also husband and wife. There is, therefore, still another ground, and one with a shorter circuit, which justifies the holding in favor of plaintiffs. The rule seems well settled that the marital relationship is subject to its own special restriction, or, at least, presumption. On policy grounds,

it has been held in the case of a trustee that where property is transferred to or interest created in a spouse, in violation of a fiduciary obligation, the transferee spouse takes subject to fiduciary obligations of the transferor spouse (*Matter of Fulton*, 253 App. Div. 494, and cases cited therein; *London* v. *Goodman*, 6 Misc 2d 277, 281; Restatement, Trusts 2d, § 170, comment e; 26 Am. Jur., Husband and Wife, § 127; 90 C. J. S., Trusts, § 305). So, on any view of the relationship between the Schwamms, Mrs. Schwamm may not be deemed an innocent purchaser.

In the foregoing discussion no separate treatment has been given to the fact that, of the original 10,000 shares in suit, half rest in the estate of Mr. Schwamm and half rest in the estate of Mrs. Schwamm. The contention, which is found untenable, that Mrs. Schwamm must be treated as an innocent purchaser obviously relates only to the shares in her estate.

The other shares which have found their way, albeit by intermediate transfer, into the estate of Mr. Schwamm are more easily subjected to plaintiffs' claim. The rule is well settled that where a wrongdoer reacquires property or interests transferred to an innocent purchaser in violation of his fiduciary duty, he may be compelled to surrender the property or the interests to the rightful owner (*Clark* v. *McNeal*, 114 N. Y. 287, 295; *Independent Coal Co.* v. *United States*, 274 U. S. 640, 647–649; Restatement, Restitution, § 176.) Hence, a fortiori, the 5,000 shares now in the estate of Mr. Schwamm are subject to plaintiffs' claim.

The laches issue raised by defendants was properly determined by the trial court in the exercise of a sound discretion. Laches is an equitable doctrine which is applied after viewing all of the circumstances, accompanied by a measurement of the inexcusable delay, the irreversible detriment to defendants, and the nature and degree of the wrong for which redress is sought. Significant in this case is the absence of such irreversible detriment and the infidelity practiced. (*Weiss* v. *Mayflower Doughnut Corp.*, 1 N Y 2d 310, 318; Restatement, Restitution, §§ 64, 69; 2 Pomeroy, *op. cit.*, § 418 *et seq.*, especially § 419d; 30 C. J. S., Equity, § 115 *et seq.*)

Accordingly, the judgment in favor of plaintiffs should be affirmed, with costs to plaintiffs-respondents.

RABIN, M. M. FRANK and VALENTE, JJ., concur; STEVENS, J., dissents and votes to reverse and grant judgment to defendants on the ground that the specific *res* of the alleged constructive trust is not sufficiently identified and on the ground of laches.

Judgment affirmed, with costs to the plaintiffs-respondents.