EDGAR M. MILLER et al., Appellants, v EDGAR S. K. MERRELL, II, Respondent.

Fourth Department, February 20, 1980

### APPEARANCES OF COUNSEL

*Leonard H. Amdursky* for appellants.

*Mackenzie Smith Lewis Michell & Hughes (John F. Lawton* of counsel), for respondent.

### OPINION OF THE COURT

WITMER, J.

The basic question presented on this appeal is whether the defendant, who stood in a fiduciary relationship with his brother and the two plaintiffs, can be declared to be a con-

structive trustee for them and himself of real property purchased by him but in which none of them previously held an interest and toward the purchase price of which none of the others contributed. We answer in the affirmative. An understanding of this case requires a review of some of the family history of the parties.

Plaintiffs are brothers and are first cousins of defendant, Edgar S. K. Merrell, II, and his brother Nathaniel B. Merrell. Their grandfather was Judge Edgar S. K. Merrell who died in 1942 survived by his daughter, Charlotte Miller, plaintiffs' mother, and by his son Nathaniel E. Merrell, the father of defendant and Nathaniel B. Merrell. At his death the grandfather owned what was known as the "Crystal Lake property", consisting of about 300 acres of land surrounding a heart-shaped lake about 40 acres in size. He devised the property to his wife for life and upon her death to his son and daughter equally. After his death the property was known as "the estate of Edgar S.K. Merrell", and was so taxed. There were two "camps" or cottages on the property. After the death of the grandfather's widow in 1953 one of the camps was used by Charlotte and the plaintiffs and the other by Nathaniel E. and his children. Later a third camp was built thereon for use by Edgar M. Miller.

Following in his father's footsteps, Nathaniel E. Merrell was a lawyer; and his two sons, defendant and Nathaniel B., also became lawyers. They practiced law together under the name of Merrell & Merrell with offices on the second floor of a building owned by Nathaniel E. in Lowville. Plaintiffs were both dentists and they had their offices on the main floor of the same building.

Under an informal arrangement between plaintiffs and members of the law firm of Merrell & Merrell, the plaintiffs did all the dental work for the Merrells and their families without charge and, also without charge, the Merrells did all the legal work of the various family estates and all personal legal work required by plaintiffs. The real property taxes on the Crystal Lake property during the lifetime of Nathaniel E. Merrell were paid by him and apportioned between him and his sister Charlotte until her death in 1966 and thereafter among him and the plaintiffs in accordance with their respective interests. After the death of Nathaniel E. Merrell in 1974, defendant paid the taxes on this property and apportioned them among plaintiffs and himself and his brother Nathaniel

B. Merrell. In 1962 the Merrell law firm negotiated with the State Bureau of State and Private Forestry Lands regarding lumbering on the Crystal Lake property, to avert increases in the tax assessment thereon.

The Merrell law firm drew Charlotte's will, in which plaintiffs were named as executors, and upon her death the law firm had the will probated, represented plaintiffs as executors thereof and advised with them in the management of the Crystal Lake property. The events giving rise to this lawsuit occurred in 1972. At that time Charlotte's estate had not been settled, and the law firm was continuing to handle all legal aspects of that estate and of plaintiffs' other legal requirements. This leads us to the issues in this case.

Adjoining the Crystal Lake property on the west was an 83-acre parcel of wooded land and also a house and lot across the road from it, all owned by Mr. and Mrs. Peake, for whom the Merrell law firm also did legal work. In June, 1972 defendant went to the home of plaintiff John S. Miller and informed him that defendant had been advised by the Peakes that their property was for sale and they had offered to sell it to defendant, and he asked whether John was interested in it. John told defendant that he would personally like to buy the 83-acre parcel. He testified that defendant replied that the property should be bought by plaintiffs and defendant and his brother Nathaniel B., because it would enhance the Crystal Lake property and give that property more woodland under the Forestry Management Act. John responded that he would go along with whatever the others agreed to do. Defendant denied such conversation, except that he admitted asking John whether he would be interested in joining in the purchase, and saying to John that the Peakes would try first to sell the house and land across the road. Defendant further testified that he also talked with his brother Nathaniel and asked him whether he would like to join in buying the woodlot and Nathaniel said that he would.

In July, 1972 plaintiff John Miller learned that the Peakes had sold the house, and he went to the Merrell law office and spoke with defendant and his father about purchasing the 83-acre woodlot; and he examined a map of the property. A few days later John spoke with Mrs. Peake and got permission to examine the cabin on the property. John testified that in early August defendant telephoned to him and said that the Peakes wanted $650 for the parcel and that if John and his brother

Edgar, plaintiffs herein, would each give him a check for an equal one-quarter share of it he would take care of it, and John said "OK". Defendant acknowledged calling John and telling him the price of the property, but denied asking for payments from plaintiffs. Later John telephoned to defendant and suggested that the property should be bought in the name of the estate, and defendant said that he would speak with his father about that; but defendant did not recall such conversation. Defendant's brother Nathaniel however, remembered that he and defendant discussed with plaintiff John Miller whether title to the Peake lot should be taken in the name of the estate or in the names of the four cousins individually.

In late August John took his son, his brother Edgar's son, defendant's son and Nathaniel B.'s sons to the Crystal Lake property and they spent the day marking the west boundary line between it and the Peake woodlot. On September 5, 1972 plaintiff John Miller went to defendant's law office and defendant told him that on August 18, 1972 he had bought the Peake property for himself and recorded the deed. Nathaniel B. Merrell testified that before August 18, 1972 defendant stated in the presence of him and their father that he was going to buy the Peake property in his own name and that both Nathaniel and his father expressed surprise at such statement, and Nathaniel told defendant that he could not do it and it should be bought for an estate. Later, after defendant did take title for himself, he asked Nathaniel B. to tell that to the plaintiffs but Nathaniel refused to do so.

In 1973 Nathaniel E. Merrell conveyed his interest in the Crystal Lake property to himself and his two sons, the defendant and Nathaniel B. The father died in 1974 and defendant and brother Nathaniel B. then became equal owners with plaintiffs in the property as tenants in common. Thus, at the time of the Peake transaction in 1972 neither the defendant nor his brother Nathaniel had any legal interest in the Crystal Lake property.

In partial justification for his action in buying the Peake property in his own name, defendant pointed to a purchase made a couple months previously by plaintiff Edgar M. Miller in his own name of some property two or three miles away from the Crystal Lake property, which purchase was effected without consulting defendant. That transaction is irrelevant to the issue herein. Although the trial court saw fit to men-

tion it in its findings of fact, we find it to be without significance in this case.

The parties agree that the trial court was mistaken in finding that plaintiff John Miller told defendant that he was not interested in buying the Peake property. The evidence is clearly to the contrary. The court found that a fiduciary relationship existed between defendant and the plaintiffs, but it concluded that because plaintiffs had made no contribution to defendant toward the purchase price for the property, defendant was not unjustly enriched and no constructive trust could be erected upon the transaction. We agree that a fiduciary relationship existed between these parties; and we hold that because it did, the trial court erred in its conclusion of law.

"A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee" *(Beatty v Guggenheim Exploration Co.,* 225 NY 380, 386; and see *Sharp v Kosmalski,* 40 NY2d 119, 121; *Goldsmith v Goldsmith,* 145 NY 313, 318; *Reynolds v Snow,* 10 AD2d 101, 110, affd 8 NY2d 899; *Kaplan v Meyer,* 271 App Div 837). A formal trust or written agreement is not necessary to establish a constructive trust *(Sharp v Kosmalski, supra,* p 122). It does not arise from the intention of the parties but as a means for a court of equity to right a wrong facilitated by breach of a fiduciary relationship *(Meinhard v Salmon,* 249 NY 458; *Tomaino v Tomaino,* 68 AD2d 267, 269-270). Such a fiduciary relationship may be found, as illustrated in the above-cited cases, in transactions concerning common ownership of property and in close family ties with a history of trust in the mutual actions of the parties (and see *Penato v George,* 52 AD2d 939, 942, app dsmd 42 NY2d 908). It exists as a matter of law between an attorney and his client.

In this case in 1972 defendant was not a legal co-owner with plaintiffs of the Crystal Lake property; but in the circumstances of this family, wherein the grandfather had devised the property to his children, whose children in turn used it as the vacation base for the family clan, defendant knew that he was an eventual owner of it and had a family interest in it. This reasonable expectation turned into reality in 1973 and 1974. Thus the parties had mutual interests in this property

and their actions demonstrated that they recognized mutual obligations with respect to it. The testimony of plaintiff John Miller, corroborated by that of defendant's brother Nathaniel and the substantial admissions by defendant, lead to the irresistible conclusion that in the summer of 1972 the parties had agreed to buy the Peake woodlot as an addition to the Crystal Lake property, to enhance the latter's value and protect the family interests therein; and that to all intents and purposes defendant was proceeding to accomplish that purpose. The relationship alone, together with the apparent and implied agreement that defendant would acquire the Peake lot as an addition to the Crystal Lake property, was sufficient to create a constructive trust upon the lot when purchased by defendant personally.

The pre-eminent authority on the law of trusts, Professor Emeritus Austin W. Scott of the Harvard Law School, in his treatise on The Law of Trusts (vol 5, 3d ed, § 499) has written (pp 3537-3538), "A person in a fiduciary relation to another who purchases property for himself individually may be chargeable as constructive trustee of the property, even though he purchases it from a third person and not from himself as fiduciary".[1] At page 3540 Professor Scott wrote, "a constructive trust will arise where there is a confidential relation arising out of a family connection or otherwise".[2] At page 3543 the author further wrote, "Even though there was no pre-existing fiduciary relation, and even though the defendant was not employed professionally by the complainant, and even though no continuing fiduciary relation was contemplated, yet if the defendant undertakes with the complainant to purchase property for him, and purchases the property for himself, he can be charged as constructive trustee of the property. Although the oral undertaking is not enforceable as a contract, because of lack of consideration or because the property is an interest in land, yet a fiduciary relation is created and the fiduciary will not be permitted to profit through a breach of his duty as fiduciary. By undertaking to purchase the property for the complainant, the relation of principal and agent is created. Such a relation arises where

1. See *Gaines v Hamman,* 163 Tex 618; *Berenson v Nirenstein,* 326 Mass 285; *Mackey v Baker,* 327 Mich 57; *Goldstein v Marsella,* 136 NJ Eq 521, affd 137 NJ Eq 513, and see *Wendt v Fischer,* 243 NY 439, 443-444.

2. See *Sladen v Rowse,* 115 RI 440; *Jones v Clary,* 194 Va 804; *Rome v Fincke,* 53 So 2d 712 [Fla].

one person undertakes to act for and in behalf of another, even though the undertaking is gratuitous and oral."[3] This is true even though the defendant purchased the property with his own money and took the conveyance to himself (*Sladen v Rowse,* 115 RI 440; *Martin v Underhill,* 265 NC 669; *Harrop v Cole,* 85 NJ Eq 32, affd 86 NJ Eq 250).

The common-law principles above recited were codified years ago in the Restatement of the Law of Restitution wherein it is stated in section 190, "Where a person in a fiduciary relation to another acquires property, and the acquisition or retention of the property is in violation of his duty as fiduciary, he holds it upon a constructive trust for the other." In section 194 thereof the law is restated as follows:

"(1) A fiduciary who purchases from a third person for himself individually property which it is his duty to purchase for the beneficiary holds it upon a constructive trust for the beneficiary.

"(2) A person who agrees with another to purchase property on behalf of the other and purchases the property for himself individually holds it upon a constructive trust for the other, even though he is not under a duty to purchase the property for the other." (See, also, Douthwaite, Attorney's Guide to Restitution, § 5.4, p 184 *et seq.*)

In *Meinhard v Salmon* (249 NY 458, 464, *supra*) Chief Judge CARDOZO summed up the above principles as follows: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions (*Wendt v. Fischer,* 243 N.Y. 439, 444). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

Beyond the foregoing principles, however, is the fact that defendant was an attorney at law and plaintiffs were his clients. As such he had a special duty to the plaintiffs (see

---

**3.** See *Sladen v Rowse,* 115 RI 440.

*Howard v Murray,* 43 NY2d 417, 421; *Matter of People [Bond & Mtge. Guar. Co.],* 303 NY 423, 430).

It appears that even defendant himself, as attorney for the family, originally intended to buy the Peake lot for the estate or for the individual owners thereof, for he admitted that it was only a short time before the closing that he decided to buy it for himself. Having undertaken to act in such fiduciary capacity, he could not change his status on his own initiative without the consent of his principals (see Scott, Trusts, vol 2, 3d ed, § 170.8, and vol 5, § 499, pp 1320, 3546).

Defendant's contention that plaintiffs' laches in failing to institute this action for over four years after learning of defendant's purchase of the land for himself precludes this action, is without merit. The defense of laches rests upon resulting prejudice *(Marcus v Village of Mamaroneck,* 283 NY 325, 332). Mere delay by plaintiffs, without a showing that defendant has changed his position and is prejudiced, is insufficient to bar plaintiffs for laches *(Marcus v Village of Mamaroneck, supra; Weiss v Mayflower Doughnut Corp.,* 1 NY2d 310, 318; *Reynolds v Snow,* 10 AD2d 101, 111, affd 8 NY2d 899, supra).* Defendant made no effort to establish that he was prejudiced in any respect by the delay.

The judgment should, therefore, be reversed, the complaint reinstated and judgment granted for plaintiffs declaring that defendant holds the Peake woodlot in trust for the plaintiffs and for himself and his brother Nathaniel B. Merrell as equal tenants in common, subject to the several payments by the plaintiffs and Nathaniel of an aliquot part of the price which defendant paid to the Peakes for the property.

CARDAMONE, J. P., DOERR and MOULE, JJ., concur.

Judgment unanimously reversed, on the law and facts, with costs, complaint reinstated and judgment granted plaintiffs, in accordance with opinion by WITMER, J.