INTERSTATE PROPERTIES, Plaintiff,

v.

PYRAMID COMPANY OF UTICA, Robert J. Congel, Leonard Leveen, James McDonald, Joseph Scuderi, Gerald Dick, Woodchuck Hill Associates, and Teachers Insurance and Annuity Association, Defendants.

No. 81 Civ. 1874 (RLC).

United States District Court,
S.D. New York.

Feb. 23, 1984.

Finley, Kumble, Wagner, Heine, Underberg & Casey, New York City, for plaintiff; Neil Underberg, Alan M. Gelb, P.C., Jerome Kowalski, Frederick S. Gold, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City and Bond, Schoeneck & King, Syracuse, N.Y., for Pyramid defendants; Sanford M. Litvack, New York City, Thomas J. Valenti, James E. Wilber, Syracuse, N.Y., of counsel.

Meyer K. Sanoff, New York City, for defendant Teachers Ins. and Annuity Ass'n.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiff, Interstate Properties ("Interstate"), is a New Jersey general partnership, with three partners: Stephen Roth, Russell B. Wight, Jr. and David Mandelbaum. Its principal place of business is Clifton, New Jersey, and each of its partners is a citizen of New Jersey. The partnership was formed in 1968, and since then has been principally involved in the development and operation of regional mall shopping centers in Manassas, Virginia; Reading, Pennsylvania; Battle Creek, Michigan; Huntington, West Virginia; Binghamton and Utica, New York, and five or six other locations.

Defendant, Pyramid Company of Utica ("Pyramid"), is a New York general partnership consisting of Robert J. Congel, Woodchuck Hill Associates (also a New York general partnership), Leonard Leveen, James McDonald, Joseph Scuderi and Gerald Dick. Its principal place of business is DeWitt, New York. It is one of various partnerships spun off from the Pyramid Company, which was established in 1969 or 1970 by Congel and two other partners to develop shopping centers. The company is considered the umbrella organization and handles the clerical work for the partnerships. These are formed by the company to handle specific shopping center projects. They are usually composed of several partners from the company and generally remain in operation until a project is completed. In this manner, the Pyramid Company has developed a number of regional mall shopping centers in upstate New York.

Pyramid was formed in 1977 to develop the shopping center mall involved in this case. That year Pyramid made plans to construct a two-storied regional shopping center in New Hartford, New York. It secured a commitment from defendant, Teachers Insurance and Annuity Association ("Teachers"), a New York corporation with its principal place of business in New York City, for a permanent mortgage loan of $26 million on the proposed mall.

Interstate owned and managed the Riverside Mall, a shopping center in Utica, New York and held options on some valuable property adjacent to the area. Sears Corp. and J.C. Penny Co. were interested in a regional shopping center being built in the Hartford vicinity. Both organizations expressed displeasure that Pyramid and Interstate were not working together so that the project they desired could be built and pressured the two parties into joining forces to build the mall. Discussions between Pyramid and Interstate began in the spring of 1978, culminating in December, 1978 in a Joint Venture Agreement ("JVA") pursuant to which Interstate and Pyramid agreed to pool their resources to construct, develop and operate the Sangertown Regional Mall ("Sangertown"), the subject of this litigation.

Under the JVA, Pyramid was afforded the active role of constructing, developing, financing, managing and securing tenant occupancy of the mall until such time as Interstate contributed Riverside Mall to the enterprise. At that point, at its option, Interstate could elect to take over management of the enlarged operation. JVA 3A.1, 7.1(a)(b)(c), 7.2.

Pyramid was responsible for securing construction financing for the mall, and the funds secured for permanent financing

were to be retained by Pyramid for payment of incurred obligations in the following order of priority: (1) construction mortgage financing, (2) payment of all unpaid development costs, (3) $2 million to Interstate, and (4) balance to Pyramid. JVA 3.1.

Section 5 of the JVA provides for a stabilized cash flow to Pyramid when full occupancy of the new mall is reached. All expenses, costs of development and construction of the new mall, JVA 2.2.2, and all decisions in regard thereto, as long as not inconsistent with any of the terms of the agreement, were solely Pyramid's responsibility. JVA 2.2.1, 2.2.2. Pyramid agreed to keep Interstate informed on a regular basis as to the status of the development of the new mall "including without limitation ... the granting or failure to grant any approval required for construction of the New Mall, the status and terms of leasing and costs of development." JVA 2.2.3(a).

Pyramid was given authority to make all decisions concerning financing or refinancing of the new mall, JVA 8.1.1, but this authority was qualified by JVA 8.1.2(a). The latter provision states that "[a]ll mortgages placed against [the] New Mall shall be limited to the first mortgages held by an institutional lender in an amount not to exceed 75% of such lender's appraisal of the New Mall; except for the initial construction mortgage, the terms and provisions of each such mortgages must provide for full amortization of the principal amount thereof at constant equal (monthly, quarterly, semi-annual or annual) payments over the term of the loan so obtained."

JVA 8.1.2(b) provides that the initial construction mortgage shall not exceed the principal amount of the initial permanent mortgage that is fundable.

JVA 8.1.2(d) provides that Pyramid agrees to use its best efforts to require all mortgagees of the new mall to give to Interstate notice of all defaults with a reasonable opportunity to cure the default.

JVA 8.1.2(e) provides that Interstate, on curing a default, becomes sole joint venturer, but Pyramid could reinstate its interest within six months by paying to Interstate the funds advanced plus interest at 1% above the prime rate of Citibank.

JVA 8.5.1 provides that proceeds for initial financing of any expansion are to cover all costs and expenses of the expansions, with the remainder, if any, being divided equally between Pyramid and Interstate.

JVA 15.1 provides that the life of the JVA is 99 years.

Chase Manhattan provided the financing for construction of the mall which was initially planned as a three-department store shopping complex. The Chase loan was secured by the personal guarantees of Pyramid partners and their wives. The three main tenants were Sears, J.C. Penny and Amerada Hess. The new mall opened for business in the early summer of 1980. Sears opened its store in July, Hess in August and J.C. Penny in November—all in 1980.

The mall was considerably larger than the shopping center Pyramid had proposed in 1977 when it secured Teachers' $26 million commitment. At that time the Teachers' loan carried a 9% interest rate. As of March, 1980, however, apparently because a larger permanent mortgage was going to be required for the new mall being built, Pyramid had taken no action to secure the $26 million from Teachers. In 1979–80 interest rates had begun to climb upward, and by March, 1980 the prime rate had risen to approximately 15–17%.

At around that time, lengthy negotiations with Teachers began with Pyramid seeking to persuade Teachers to commit more funds to the project and with Teachers seeking a return more in accord with current interest rates then available to institutional lenders on any funds it decided to commit. Pyramid informed Teachers of the JVA terms relating to size and type of mortgage that Pyramid was permitted to obtain.[1]

---

1. The evidence is conflicting as to Teachers' awareness of the terms of the JVA. There is

Since no permanent mortgage was in place, Chase was becoming increasingly nervous about the repayment of its construction loan and began pressing Pyramid to conclude a financing agreement with Teachers large enough to reimburse Chase fully for all the monies it had advanced for construction of the mall.

On or about February 28, 1980, Teachers requested L.W. Elwood, Inc. ("Elwood") to appraise the new mall. The request was in writing and the letter from Teachers authorizing the appraisal detailed what the appraiser was being asked to do. The letter stated: "we will expect to receive a full narrative-type report... with particular emphasis on satisfactory substantiation, documentation of comparables where applicable [in respect of] land value, income and detailed expense estimates, market data information and justification of the capitalization method and rates used." Elwood submitted its appraisal to Teachers in September, 1980.

When the appraisal was made there were three department stores on the site. The available rental and lease space in the mall was roughly 726,675 sq. ft. The average rent was estimated at $13.33 per sq. ft. The population trend in the area was viewed as moderately downward. The work force in the area was classified as mainly blue collar with an income level below the state's average. The new mall was viewed as the dominant shopping mart in the area and was appraised at $52 million. The appraisal was detailed and its conclusions were substantiated as requested in Teachers' letter of authorization.

During this period, Pyramid remained in controversy with both Chase and Teachers. Pyramid was having difficulties concluding an agreement with Teachers to increase its permanent mortgage commitment without violating the terms of the JVA and began

contemplating litigation against Teachers to require it to live up to its 1977 commitment. Pyramid defaulted, for reasons not made clear at trial, on its loan to Chase, and Chase instituted litigation against Pyramid on the default. Interstate was not advised of the default on the Chase loan and apparently did not learn about it until discovery commenced in this litigation. Pyramid apparently did keep Interstate informed, to an extent, of its negotiations with Teachers and sought unsuccessfully to obtain Interstate's approval to allow it to sign an agreement with Teachers at variance with the terms of the JVA.

Pyramid and Teachers managed to resolve their difficulties, however, and a final agreement was reached on March 17, 1981. In March, 1981, Teachers authorized Elwood to undertake a second appraisal of the mall. On this occasion, the instructions from Teachers were not in writing, as the earlier authorization had been. Thus, there is nothing to confirm what Elwood was told, except the recollections of the interested parties. We do know, however, that when the second appraisal was undertaken, the appraisers knew that Teachers wished to conclude a mortgage agreement of $49 million covering the mall and that the $52 million value placed on the mall in September, 1980, was too low to permit a $49 million loan since Teachers was required both by New York Insurance Law and the JVA terms to limit its mortgage commitment to 75% of the appraised value of the mortgaged property.

Elwood's March, 1981 appraisal placed the value of the mall at $66.1 million. The only change in the property that had occurred since the September, 1980 appraisal was an expansion of the mall by the addition of a fourth department store, Bradlees, and satellite stores. The change brought the gross leasable mall space from

---

evidence that one of the employees of Pyramid did not want Teachers to see the JVA itself, but Robert Congel, managing partner of Pyramid and chief negotiator with Teachers, testified that Teachers knew what the terms of the JVA were. Another indicia of Teachers' knowledge is that the first draft of the permanent mortgage agree-

ment contained signature lines for both Interstate and Pyramid. The final agreement, however, had provision only for the signature of Pyramid. I find that Teachers was informed and knew the terms of the JVA during the course of the negotiations.

729,932 sq. ft. to 847,575 sq. ft. Because the March appraisal lacks any internal substantiation, the basis of the $14.1 million rise in the evaluated worth of the mall is not clear.

In any event, on March 17, 1981, Teachers issued a commitment for a permanent mortgage in the principal amount of $49.2 million, payable over a 35 year term at an interest rate of 11% per annum, with contingent interest equal to 50% of the annual gross receipts from the operation of the mall in excess of $6,174,804.00, and a due on sale provision which provides prepayment of contingent interest in the event of a sale. No payment on principal is to take place for 17 years, and there is a penalty for early payment by Pyramid.

As of the time of trial, Teachers had paid out $47.5 million of the $49.2 million commitment. The $35.57 million in construction funds received from Chase was paid off with these funds and the remainder of the mortgage funds received by Pyramid were allocated to salaries for various Pyramid partners for managing the project, to pay the litigation costs incurred in the foreclosure suit by Chase and in this case, to a loan or grant to Pyramid Co., and to what defendants' witness described as development costs. Thus far, no funds have gone to Interstate, and as of the date of trial the project was still in a deficit cash flow posture and stabilized cash flow had not been achieved.

Plaintiff contends that both defendants have perpetrated a fraud on Interstate in derogation of its rights under the JVA, and that Pyramid had breached its fiduciary obligations under the agreement. Plaintiff seeks a declaration: (1) that the March, 1981 appraisal is fraudulent; (2) that the mortgage loan of $49.2 million exceeded 75% of the value of the mall; (3) that the proper size of the mortgage is $41.25 million; (4) that Teachers be required to remain the mortgagee of the mall but on a reduced mortgage; (5) that Pyramid be required to pay back to Teachers any monies received in excess of $41.25 million; (6) that the contingent fee and due on sale provisions violate the JVA and are null and void and unenforceable; (7) that paragraph 47 of the mortgage agreement providing for acceleration of payments due in the event of an adverse judgment in this litigation is unenforceable; (8) that the Bradlees addition to the mall and the satellite stores contained therein constitute an expansion of the mall within the meaning of JVA, 2.2.3(c), 8.5.1 and 8.5.2; (9) that Pyramid separately account for additional funds due Interstate attributable to the mall's expansion; (10) that Pyramid be required to make a full accounting to Interstate and upon such accounting, judgment be entered as of December 31, 1982 (a) in the sum of $1,062,837 with interest at 1½% over prime for funds misappropriated for the private benefit of Pyramid affiliates; (b) in a sum equal to all unpaid interest at 1½% over prime on the sum of $2,624,334 of funds misappropriated from the partnership; (c) in the sum of $456,069 with interest, for legal fees paid to attorneys for Pyramid and Teachers; (d) in the sum of $399,266 with interest for management fees improperly paid; (e) in the sum of $224,182 with interest for salaries improperly paid Congel, Leveen, McDonald, Scuderi and Dick; (f) and that judgment be entered jointly and severally against Pyramid and the above-named individual defendants and that all the aforesaid sums be ordered paid to the Joint Venture for appropriate distribution pursuant to the terms of the JVA; (g) in addition, plaintiff seeks judgment that the sum of $91,823 on the Wicks and Greenman lease be applied on JVA books solely against Pyramid's account; (h) a judgment in the sum of $2,436,500 or $1,647,500 plus interest from March 24, 1982, dependent upon the Court's determination as to the proper size of the first permanent mortgage, as Interstate's proper share of the permanent mortgage; and (i) punitive damages against Pyramid, the individual defendants and Teachers.

*Determination*

The JVA conceived of the construction of the new mall as a long range profitable enterprise for the partners in the venture.

The initial development and construction costs were to be financed by institutional lenders. These costs, in turn, were to be met from the proceeds of the permanent long term mortgage, and the latter was to be liquidated by income from the mall leaving, after a time, a handy financial profit for division among the partners.

All the initial risks of failure and financial exposure were placed on Pyramid. Interstate donated to the enterprise some valuable land options it held, and once the new mall was a going concern it could, but was not required to, incorporate its prime asset, Riverside Mall, among the assets of the venture. In the interim, Pyramid had sole responsibility for securing development, construction and permanent mortgage financing. The agreement placed specific limits on the nature, type and amount of financing Pyramid could obtain, but no limit on its responsibility to secure it. Pyramid could design the mall in any style it saw fit, and it had to do all spade work necessary to get the project off the ground. Any financial deficits incurred were Pyramid's problem. In short, Pyramid had all the burdens of getting the new mall constructed and operating at a profit. At that point Interstate was free to come in and share in the rewards.

Nonetheless, the agreement cannot be given a distorted reading merely because it may appear to the Court that one of the parties may have made a disadvantageous bargain. *Aloi v. Board of Education of West Babylon Union Free School District*, 81 A.D.2d 874, 439 N.Y.S.2d 169 (1st Dep't 1981); *Messina v. Lufthansa German Airlines*, 64 A.D.2d 890, 408 N.Y.S.2d 109 (2d Dep't), *aff'd* 47 N.Y.2d 111, 417 N.Y.S.2d 39, 390 N.E.2d 758 (1978); *Leibowitz v. County Trust Co.*, 19 A.D.2d 843, 244 N.Y. S.2d 599 (2d Dep't 1963). The Court must construe the contract as it finds it. *Bayview General Hospital v. Associated Hospital Service of New York*, 45 Misc.2d 218, 256 N.Y.S.2d 471 (Sup.Ct.N.Y.Co.1964). The JVA was the result of arms-length bargaining by experienced and sophisticated parties thoroughly conversant with the hazards of the venture upon which they were embarking. There are no ambiguities in the language of the agreement, and indeed no issue on that score has been raised. Under such circumstances the language of the agreement controls. *Todem Homes, Inc. v. Freidus*, 84 Misc.2d 1023, 374 N.Y. S.2d 923 (Sup.Ct. Suffolk Co. 1975). Viewing the argument from that perspective, as the Court must, it is clear enough that, in many respects, Pyramid did not keep its bargain.

■ Pyramid charged to the Joint Venture attorney's fees paid in connection with its defense of Chase's litigation for default payment on the construction loan and for its defense of litigation in this case. Both allocations are clearly improper. Both these matters were Pyramid's responsibility, and the JVA cannot be burdened with these liabilities. The default was Pyramid's deliberate decision, and under the agreement, was its sole responsibility. The agreement, in spirit, at least, required Pyramid to notify Interstate that it had defaulted. The letter of the agreement required Pyramid to use its best efforts to have Chase notify Interstate so that the latter could, if it wished, cure the default. If Interstate had been advised of the default, it might have remedied it, and no litigation would have been commenced by Chase. Even if a strict reading of the agreement did not mandate that Pyramid advise Interstate that it had defaulted, the JVA certainly could not be read to authorize Pyramid to charge Interstate with part of the costs of the ensuing litigation. It is also clear that Pyramid cannot charge the JVA and thereby burden Interstate with the costs Pyramid incurs in defense of this litigation. Pyramid is ordered to pay to JVA with interest $456,069 which it used from permanent mortgage funds to pay its litigation expenses, plus any such additional sum so expended since the trial.

■ Pyramid took some $2,624,334 of the permanent mortgage funds and transferred it to the Pyramid Co. There is nothing in the JVA to warrant a payment or loan to Pyramid Co. As to those funds

that are held by Pyramid Co. in constructive trust, *Rosen v. Rosen*, 78 A.D.2d 911, 432 N.Y.S.2d 921 (3d Dep't 1980), they must be accounted for and paid with interest into the JVA account for distribution in accord with JVA 3.1. *Miller v. Merrell*, 73 A.D.2d 128, 424 N.Y.S.2d 949 (4th Dep't 1980). The rights and duties of a partnership are controlled by their agreement. *Missan v. Schoenfeld*, 111 Misc.2d 1022, 445 N.Y.S.2d 856 (S.Ct.N.Y.Co.1981).

■ Pyramid paid out some $224,182 in salaries. Those funds were allocated to various Pyramid partners and employees for work allegedly performed in the development and management of the mall. Allocation of funds to various Pyramid partners and employers for services performed would be proper only if the services being paid for were appropriately classified as development costs—that is, costs in acquiring the various parcels of land that became the situs of the mall, in getting approval for desired use of the land and construction of the mall, in securing the construction mortgage loan, in securing the contracts from various construction companies to build the mall, and in attempting, before construction has been completed, to secure tenants for the mall. There is no testimony that these services were among any of the above categories. Moreover, because defendants acted in such egregious disregard of plaintiff's rights and made no conscientious effort at trial to define what these funds were expended for, except to categorize the payments in a conclusory fashion, these salary disbursements are disallowed as development costs and are to be paid into the JVA account with interest for distribution in accord with the JVA. Salaries of Pyramid may be paid out of

Pyramid's share of the permanent mortgage fund after Chase and after Interstate have received their share.

■ Nor may Pyramid partners retain the $399,266 paid for managerial services. As I understand the testimony, the operative formula for mall tenants provides that each tenant must contribute 3% over his annual rent and this fund is the source used to pay for management services at the mall. There is no provision in the JVA for payment of funds to Pyramid to manage the mall, and clearly nothing in the agreement warrants such payments to Pyramid partners and employees before Interstate's share of the permanent mortgage is paid. Consequently the funds paid to Pyramid partners and employees are to be paid with interest to the JVA account for disbursement as provided by the JVA.

The Bradlees addition and satellite stores constitute an expansion of the project within the meaning of JVA 2.2.3(c), 8.5.1(b) and 8.5.2 and a full accounting must be made to Interstate on this phase of the construction of the mall to determine what, if any, monies are due the JVA account for distribution to Interstate.

■ The permanent mortgage itself violates the terms of the JVA in several respects. The mortgage does not by its terms and provisions provide for full amortization of the principal amount at constant equal payments over the term of the loan as JVA 8.1.2(a) requires. The annual contingent interest that Teachers would receive under the mortgage agreement, 50% of the mall's annual gross in excess of $6,174,804, is bound to vary from year to year based on the profitability of the mall.[2]

2. At the trial plaintiff made considerable effort to demonstrate that the contingent fee mortgage provision invaded its equity and made Teachers a partner in the JVA. That contention may be true but it is irrelevant. The repayment of any mortgage requires the debtor to pay to the lender monies that the debtor could pocket or use for his own purposes if the mortgage obligation had not burdened his property. To that extent, the equity the debtor holds in the property is invaded, but that is the price the debtor agreed to pay to obtain the loan. However, the form of

the contingent interest provision is a breach of the agreement.

The due on sale provision does not appear to me to be contrary to 8.1.2(a) for the same reasons I find the above equity invasion argument unpersuasive. A mortgage providing for amortization in equal quarterly payments over the life of the loan but also providing for a penalty and acceleration in case of default would clearly not be in conflict with 8.1.2.A. The due on sale provision is in that category, a provision triggering

The second appraisal commissioned by Teachers also violates the JVA since it is unquestionably contrived. Teachers had decided on the amount and terms of the mortgage it was going to grant to Pyramid before it asked for the second appraisal. The appraiser knew that the mortgage would provide for contingent interest. It knew that it was being asked to place a value on the mall in March, 1981, sufficient to allow Teachers to make a loan on it of $49.2 million. Thus the March appraisal had to come up with a justification for the larger commitment. There is nothing in the second appraisal to substantiate this added value, and defendants' rationalizations concerning this increased value are unpersuasive. While the JVA states that the mortgage is to be 75% of the lenders appraisal of the property, the agreement clearly requires an honest appraisal, not a false evaluation which occurred in this case.

I accept the first appraisal as the honest, disinterested appraisal of what the value of the mall was as of September, 1980. The addition of Bradlees and the satellite mall space increased that value to a degree. Although 77 new leases had been signed between the September and March appraisal, four were out for signature and forty stores were not under lease; the average rents were on a downward trend going from a peak of $12.57 per sq. ft. at the beginning of 1980 to $11.53 per sq. ft. by the time of March, 1981 appraisal, falling to a low ebb of $8.19 in 1983. The appraisal of Robert Von Ansken, plaintiff's expert witness, of the property at $55 million seems the most trustworthy, and this conclusion is concurred in by Pyramid's expert.

Pyramid and the individual defendants perpetrated a fraud on Interstate by entering into the mortgage agreement in deliberate violation not only of the terms of the JVA agreement, but also of their obligations under that agreement. One gets the impression from events disclosed at trial that Pyramid and the individual defendants decided that they could not succeed in getting the mall built with the constraints imposed by the JVA. As a result, they decided to do what they felt had to be done without regard to the JVA. Having secured a permanent mortgage that exceeded JVA limitations, they again decided to forget the JVA and, after the construction mortgage had been liquidated, to disburse the proceeds of the permanent mortgage as they saw fit, in conscious derogation of their obligation to allocate up to $2 million of these funds to Interstate. Pyramid and the individual defendants were required to deal with Interstate in a trustworthy manner and could not, therefore, succumb to the callous morals of the market place. *Auld v. Estridge*, 86 Misc.2d 895, 382 N.Y. S.2d 897 (Sup.Ct.1976). Their actions constituted a violation of the fiduciary obligations they owed Interstate under the JVA and cannot be condoned. Furthermore, under the JVA agreement, Pyramid was required to hold in trust and disburse the permanent mortgage funds in a specified order of priority. Pyramid deliberately violated that portion of the agreement, and its accountant, in seeking to justify some of the disbursements under the JVA, gave contrived testimony deliberately calculated to mislead.

Because I find that Teachers had knowledge of the agreement and chose to violate it, Teachers permanent mortgage loan under both law and the JVA should have been $41.25 million. In addition, proper relief in this case must include reformation of the mortgage agreement between Teachers and Pyramid. Reformation is clearly appropriate where a contract between two parties is based upon fraudulent representations made by one of the parties. *See National American Corp. v. Federal Republic of Nigeria*, 597 F.2d 314, 322 (2d Cir.1979); *Restatement (Second) of Contracts*, § 166 (1979). There is no question in this case that Pyramid, as well as Teach-

---

the payment of certain sums to Teachers as compensation for being denied expected returns

over the life of the mortgage.

ers, violated Interstate's rights, acting fraudulently with respect to it. It is also clear that, although Interstate is not formally a party to the mortgage arrangement between Pyramid and Teachers, the latter contract was part of the agreement made by Interstate with Pyramid. In negotiating the JVA, Pyramid represented that it would act as a fiduciary for Interstate to secure a permanent mortgage for the new mall, a representation on which Interstate plainly relied. Pyramid, in obtaining the permanent loan from Teachers, was acting on behalf of the joint venture, supposedly within the parameters and terms of the JVA. Pyramid's agreement with Teachers thus embodied the understanding between Pyramid and Interstate and reformation of that agreement is the only way the Court can restore the original understanding between the latter parties.

Pyramid is ordered to return to Teachers all funds it has received in excess of $41.25 million. At the time of trial that amount was $6.75 million. The contingent interest provision in the permanent mortgage agreement is declared null and void. Teachers is required to continue to hold the mortgage at the lower figure of $41.25. The provision in the mortgage agreement for acceleration in the event the Court rules against defendant is declared null and void.

Both Pyramid, including the individual defendants', and Teachers' conduct has been so blatantly and callously in derogation of plaintiff's rights and their obligations that punitive damages are warranted. Punitive damages in the sum of $750,000 is assessed against Pyramid and the individual defendants, and punitive damages in the sum of $500,000 is assessed against Teachers, all in favor of Interstate. The $91,823 in the Wicks & Greenman lease is to be applied on JVA books solely against Pyramid's account.

All funds ordered paid to the JVA account with interest are to be paid at interest of 9% from December 31, 1982. The $6.75 million or more ordered returned to

Teachers bears no interest in view of Teachers' complicity in this matter.

IT IS SO ORDERED.